1997-NMCA-041

940 P.2d 459

**Jay LEITHEAD and Debbie Leithead, Individually and as Parents of Amanda Leithead, Plaintiffs–Appellees,**

v.

**CITY OF SANTA FE, Defendant–Appellant.**

No. 16892.

Court of Appeals of New Mexico.

Jan. 14, 1997.

Randy S. Bartell, Randy S. Bartell, P.C., Santa Fe, for Defendant–Appellant.

James V. Noble, Jr., James V. Noble, P.A., Kimball R. Udall, Sommer, Fox, Udall, Othmer, Hardwick & Wise, P.A., Santa Fe, for Plaintiffs–Appellees.

*OPINION*

BOSSON, Judge.

1.   In this case we examine whether the negligent provision of lifeguard services at a public swimming pool constitutes the negligent "operation or maintenance" of a public building, park, or equipment for which liability may be maintained under NMSA 1978, Section 41–4–6 (Repl.Pamp.1989) of the Tort Claims Act (the Act), NMSA 1978, §§ 41–4–1 to –27 (Repl.Pamp.1989 & Cum.Supp.1995). We conclude that the action may be brought under the Act even though it may also involve elements of negligent supervision of children.

FACTS

2.   Six-year-old Amanda Leithead was enrolled in a summer recreational program with the Young Men's Christian Association (YMCA). On the first day of the program, the YMCA took Amanda and other children to the Tino Griego Pool in Santa Fe, a municipal swimming pool. Amanda and other children were allowed to enter the swimming pool, in the company of YMCA counselors, without any inquiry concerning the ages or heights of the children. Regulations at the swimming pool required adult supervision for children younger than seven and under forty-

eight inches in height, but the YMCA counselors were not so advised by the lifeguards.

3. Amanda did not know how to swim. It is not known how Amanda got into the water, but sometime later a recreational swimmer discovered her floating face down in the water. He pulled Amanda from the water and alerted a lifeguard who began to administer cardiopulmonary resuscitation (CPR). Amanda was unconscious and without detectable breathing or pulse. There was evidence that she had been floating in this fashion for some four to five minutes. Amanda was then taken to St. Vincent Hospital where she regained consciousness the next day and remained for five days. There was evidence that Amanda may have suffered cognitive impairment as a result of the trauma.

4. Through her parents (Plaintiffs), Amanda sued the YMCA and the City for negligence. After settling with the YMCA, she proceeded to trial against the City, and the jury returned a verdict of negligence, assessing comparative fault as follows: 47% to the City, 43% to the YMCA, and 10% to Plaintiffs. This City now appeals and raises certain evidentiary issues in addition to the question of liability under the Tort Claims Act.

## WAIVER OF IMMUNITY UNDER THE TORT CLAIMS ACT

5. Under the general heading of premises liability, Section 41–4–6 of the Tort Claims Act waives immunity in the following instances:

> The immunity granted pursuant to Subsection A of Section 41–4–4 NMSA 1978 does not apply to liability for damages resulting from bodily injury ... caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings.

Although the classification may be "premises liability," as the Supreme Court explained in *Bober v. New Mexico State Fair*, 111 N.M. 644, 652–53, 808 P.2d 614, 622–23 (1991), the waiver of immunity is not limited to a physical defect in a building or park. *See also* Jamie McAlister, Note, *The New Mexico Tort Claims Act: The King Can Do "Little"*

*Wrong*, 21 N.M.L.Rev. 441, 455 (1991). Liability may also arise if negligent public employees operate or maintain a facility in such a way as to create an unsafe or dangerous condition on the property or in the immediate vicinity. *Id.*

6. The City initially filed a motion to dismiss Plaintiffs' complaint under NMRA 1996, 1–012(B)(6) which was denied. The City then moved to reconsider the denial which the trial court treated as a motion for summary judgment. That motion was also denied. During trial, the City continued to challenge Plaintiffs' theory of recovery by way of a motion for directed verdict. On appeal, the City argues that the trial court erred in not granting the motion to dismiss. We do not review unsuccessful pre-trial motions of this kind on appeal because even if the motion had been improperly denied, "the error is not reversible for the result becomes merged in the subsequent trial." *Green v. General Accident Ins. Co. of Am.*, 106 N.M. 523, 527, 746 P.2d 152, 156 (1987). Therefore, we analyze the claim under the Act based upon both the pleadings and the evidence elicited at trial as they became merged into the judgment.

7. The City claims that Plaintiffs' theory of recovery based on "operation or maintenance" of the municipal swimming pool is really a claim of negligent supervision, for which there is no waiver under Section 41–4–6. We disagree. The City relies upon two recent cases of our Supreme Court, *Espinoza v. Town of Taos*, 120 N.M. 680, 905 P.2d 718 (1995), and *Archibeque v. Moya*, 116 N.M. 616, 866 P.2d 344 (1993), as well as an earlier case of this Court, *Pemberton v. Cordova*, 105 N.M. 476, 734 P.2d 254 (Ct.App.1987). The cases are factually distinguishable from Plaintiffs' claim against the City. These cases stand for the proposition that to establish liability under the Act, it is not enough to show that public employees negligently supervised persons in their care and that the resulting injury occurred on public property.

8. We agree with the City that a claim of negligent supervision, standing alone, is not sufficient to bring a cause of action within the waiver of immunity created

by Section 41–4–6. However, Plaintiffs' complaint was not restricted to a claim of negligent supervision. It alleged, that "[t]he operation and maintenance of the Pool by the city subjected the City to liability for the incidents alleged herein under Section 41–4–6." Plaintiffs' complaint also alleged that the employees of the City "breached their duty to exercise reasonable care ... by failing to ... otherwise take appropriate steps to provide for the care, welfare and safety of Amanda ... and the other children while they were at the Pool." As we will discuss shortly, evidence at trial supported Plaintiffs' allegations. We think this language in the complaint and the evidence at trial were sufficient to bring the gravamen of Plaintiffs' case within the waiver of immunity provided by Section 41–4–6.

9. Analysis of the case law cited by the City confirms that this is not a case of negligent supervision. In *Espinoza*, the Town of Taos conducted a summer day camp that took the plaintiffs' child to a state park. *Id.* at 681, 905 P.2d at 719. Town employees supervising the children were inattentive and the child was injured when he fell off a slide. *Id.* The parents sued for premises liability under Section 41–4–6 arguing that negligent supervision of their child created a dangerous condition on the playground. *Id.* at 682, 905 P.2d at 720. Our Supreme Court disagreed. The Court noted that there were no physical defects in the playground, nor was the park being managed, operated, or maintained in an unsafe manner. *Id.* at 684, 905 P.2d at 722. The Town's fault lay in negligently administering a summer day camp which, of course, is not a category for which sovereign immunity has been waived under the Act. Therefore, the Court concluded that negligent supervision of a child in the Town's care did not create an unsafe condition, and, without a connection to negligent operation or maintenance of the physical premises, there was no claim under Section 41–4–6 of the Act.

10. The Supreme Court in *Espinoza* relied in part on its earlier decision in *Archibeque* in which a prison administrative employee misclassified and then released a prisoner into the general population where an enemy awaited him. 116 N.M. at 618, 866 P.2d at 346. The Supreme Court found no negligence in the maintenance and operation of the physical premises owned and operated by the state. *Id.* at 619, 866 P.2d at 347. The negligence, if any, was in how the state performed the administrative function of classifying the inmate. *Compare id. with Castillo v. County of Santa Fe*, 107 N.M. 204, 205, 755 P.2d 48, 49 (1988) (holding Section 41–4–6 contemplates waiver of immunity when an injury arises from unsafe, dangerous, or defective condition on government property that is due to negligence of public employees) *and Callaway v. New Mexico Dep't of Corrections*, 117 N.M. 637, 643, 875 P.2d 393, 399 (Ct.App.) (finding negligence of prison employees may be actionable under Section 41–4–6, when such act causes a dangerous and unsafe condition on the premises), *cert. denied*, 118 N.M. 90, 879 P.2d 91 (1994).

11. *Pemberton* involved a suit against a school board on a theory of negligent supervision when one student injured another while they were on school grounds. 105 N.M. at 477, 734 P.2d at 255. Concluding that the child's injuries did not result from negligent operation or maintenance of the physical property, this Court held that the negligent supervision claim by itself did not fall within the scope of Section 41–4–6. *Id.* at 478, 734 P.2d at 256.

12. Unlike the negligent supervision cases the City relies on, the facts in this case support recovery under Section 41–4–6. What the City labels solely as a claim for negligent supervision is, in fact, much broader and states a claim for negligent "operation and maintenance." Plaintiffs correctly argue that when City lifeguards did not adequately perform duties that were essential to public safety, they negligently operated the swimming pool and thereby created a condition on the premises that was dangerous to Amanda and the general public. Resolution of this claim does not depend on whether the lifeguards were negligent in "maintenance" as opposed to "operation," as they were clearly engaged in the latter. Under either statutory term our focus should not be confined to whether the injury results merely from a

physical defect in the facility. *Bober*, 111 N.M. at 653, 808 P.2d at 623. Our focus is on the creation of a dangerous condition on buildings and property owned and operated by the government, which is quintessentially a situation for which immunity is waived under the Act. *See Castillo*, 107 N.M. at 207, 755 P.2d at 51.

13. Plaintiffs rely on *Seal v. Carlsbad Independent School District*, 116 N.M. 101, 104, 860 P.2d 743, 746 (1993), which held that a school district could be negligent for not ensuring that lifeguards were "present *and acting as such* " at a public swimming pool. In *Seal*, the school district contracted with the Boy Scouts to operate an aquatic camp at the swimming pool and delegated to the Scouts the responsibility for providing lifeguards. *Id.* at 102-03, 860 P.2d at 744-45. Those private lifeguards failed to follow standard safety procedures and a boy drowned. *Id.* at 105, 860 P.2d at 747. The Court remanded the case to determine whether the school district had been negligent in failing to prevent hazardous conditions. *Id.* at 106, 860 P.2d at 748.

14. The *Seal* case parallels this one. The Supreme Court did not address the issue of negligent supervision in *Seal;* the issue to be resolved was whether injury had been caused by negligence in the operation or maintenance of the swimming pool itself, resulting in a dangerous condition. 116 N.M. at 105, 860 P.2d at 747. In *Espinoza*, 120 N.M. at 684, 905 P.2d at 722, the Supreme Court distinguished *Seal* in this manner:

> The playground is distinct from, for example, the swimming pool at issue in *Seal.* There, the unsafe condition of the premises was a swimming pool without the superintending lifeguard protection required by statute. Here, the playground itself, particularly the slide, was not a condition requiring supervision. Rather, it was the day-camp undertaking and not the condition of the premises that gave rise to duty.

15. A swimming pool without an adequate number of trained lifeguards creates a dangerous condition on the physical premises which affects the swimming public at large. In fact, lifeguard services are so essential to the safety of a swimming pool that they seem akin to other kinds of safety equipment, such as lifelines and ladders, that are fundamental in making the premises reasonably safe for the swimming public. Failure to provide those services in reasonable quantity and quality (lifeguards "present and acting as such") makes the premises unsafe giving rise to liability under Section 41-4-6 of the Act.

16. In sum, we conclude that the jury could reasonably determine, based on the evidence adduced at trial, that the City's failure to provide adequate lifeguard protection, which resulted in serious injury to Amanda, came within the ambit of negligent "operation" of the municipal swimming pool. Therefore, there was a waiver of sovereign immunity under Section 41-4-4(A).

## JURY INSTRUCTIONS

■ 17. The City asserts that Jury Instruction No. 2 was erroneous because it "invited the jury to find the City liable for negligent failure to supervise Amanda." It is the appellant's burden on appeal to show that the instruction was erroneous and prejudicial. *Vigil v. Miners Colfax Med. Ctr.*, 117 N.M. 665, 667, 875 P.2d 1096, 1098 (Ct.App.), *cert. denied*, 117 N.M. 744, 877 P.2d 44 (1994).

■ 18. In that jury instruction, the trial court instructed the jury that Plaintiffs had the burden of proving at least one of the following contentions to establish a claim of negligence on the part of the City:

(1) City lifeguards failed to enforce the rule that no children under seven (7) years of age are allowed in the water without adult supervision.

(2) City lifeguards failed to enforce the rule that children less than 48 inches tall must be accompanied by someone 16 years of age or older while they are in the pool.

(3) City lifeguards failed to enforce the rule that required at least one lifeguard for every twenty-five patrons in the water and deck area of the pool.

(4) City lifeguards failed to follow prescribed procedures for rotating positions in elevated stations.

(5) City lifeguards failed to enforce/follow prescribed procedures for scanning and

surveying people in the pool and deck area of the pool.

19. On appeal, the City asserts that even if one or all of these claims were proven, they do not constitute premises liability under the Act as a matter of law. The City argues that the descriptions of liability contained in the jury instructions only state claims for negligent supervision by the lifeguards. We disagree. Although the City lifeguards were required to scan their assigned areas constantly and to be able to recognize signs of distress in swimmers, their duties also included enforcing pool rules and regulations, maintaining safety equipment, responding quickly to emergency situations as well as checking swimmers into the facility. This range of duties was required of City lifeguards so that the City could safely operate and maintain this public facility. The jury instructions accurately reflect this range of duties.

20. The first two paragraphs of the jury instruction relate to the requirement that the lifeguards enforce pool regulations. The City required that children under the age of seven or under 48 inches in height must be accompanied by someone 16 years of age or older in the water. Plaintiffs alleged that the City had proper age and height restrictions for access to the swimming pool, yet neither the City personnel who admitted the children to the pool nor the lifeguards in the pool area enforced those rules with regard to Amanda. Plaintiffs' expert in water safety was of the opinion that this failure was a contributing factor to Amanda's accident. We do not see this as another example of failure to supervise, but rather as a case of lifeguards who were not properly "acting as such" and, thus, were negligently operating the City pool in such manner as to proximately cause the injuries in question. See Seal, 116 N.M. at 104, 860 P.2d at 746. The City employees negligently operated a public "park" or "building" so as to create a condition on the premises that was dangerous to Plaintiffs' child and others like her.

21. Because failure to enforce these height and age restrictions affected only some swimmers, the young and the small, the City challenges the jury instruction on yet another ground. Relying on Archibeque, the City argues that, at worst, it created a dangerous condition only as to Amanda and not the swimming public at large. The Tort Claims Act has been interpreted to apply only when negligence affects the user public generally and not just one individual. See Archibeque, 116 N.M. at 620, 866 P.2d at 348. We do not see this case in the same light. The lifeguards' neglect was not directed solely at Amanda, unlike the single misclassified inmate in Archibeque. Rather, the City neglected its duty as it applied to the entire group of children, both those with the YMCA and those present as public swimmers. Therefore, we do not believe the distinction noted in Archibeque applies to the facts of this case. We also observe that this distinction is the object of some disagreement among the members of our Supreme Court. See Archibeque, 116 N.M. at 621–22, 866 P.2d at 349–50 (Ransom, C.J., specially concurring) ("I am certain that if the operation or maintenance of a public building were to give rise to an unreasonable risk of harm for even a single individual, the immunity granted pursuant to the Act would not apply.").

22. In paragraph 3 of the jury instruction, Plaintiffs asked the jury to find that the City "failed to enforce the rule that required at least one lifeguard for every twenty-five patrons." Plaintiffs based their claim on an inadequate number of lifeguard personnel which is indistinguishable from Seal. See Seal, 116 N.M. at 104, 860 P.2d at 746 (showing negligence of the school district was in "failing to ensure that a properly trained lifeguard was present and acting as such").

23. Paragraphs 4 and 5 of the jury instruction allege that City lifeguards failed to rotate their positions properly or to follow prescribed procedures for scanning and surveying swimmers in the pool. Although, as the City notes, Seal dealt with the failure to provide lifeguard services and not the manner in which lifeguards performed their duties, we fail to see any meaningful difference. The lack of any lifeguards at a public swimming pool creates an obvious danger to the swimming public and is actionable under Section 41-4-6. The presence of lifeguards in adequate numbers but who are inattentive

or careless in performing their duties makes the premises no less dangerous and gives rise to a situation from which the jury can reasonably determine that the City negligently operated the pool. Either way, "we can identify and articulate a condition on the premises that creates a potential risk to the general public," which is the essential ingredient to liability under the Act. *Baca v. State,* 121 N.M. 395, 395, 911 P.2d 1199, 1199 (Ct.App.), *cert. denied,* 121 N.M. 375, 911 P.2d 883 (1996).

## TESTIMONY BY EXPERT WITNESSES

24. As evidence of damages, Plaintiffs elicited expert testimony from Dr. Susan Cave, a clinical psychologist, that Amanda's academic performance had been deleteriously affected by her near-drowning. Dr. Cave attempted to include in her testimony the results of an examination of Amanda which had been conducted shortly before trial and after the City's deposition of Dr. Cave had been concluded. When the City objected to the testimony, claiming unfair surprise, the trial court prohibited any reference to the recent examination.

25. Plaintiffs then elicited from Dr. Cave an opinion that Amanda had suffered cognitive or other mental impairments from the accident. Dr. Cave based her opinion, in part, on what she had learned from copies of depositions of Amanda's school teachers as well as other educational and medical records. The City again objected because, at the time of her deposition, Dr. Cave had not yet read those depositions although she had them in her possession. Dr. Cave told the City's attorney that she would review them as part of her trial preparation in the event the case actually went to trial. The trial court overruled the objection, and Dr. Cave was allowed to testify.

26. Citing *Khalsa v. Khalsa,* 107 N.M. 31, 751 P.2d 715 (Ct.App.), *cert. denied,* 107 N.M. 16, 751 P.2d 700 (1988), and *Shamalon Bird Farm, Ltd. v. United States Fidelity & Guaranty Co.,* 111 N.M. 713, 809 P.2d 627 (1991), the City claims unfair surprise to the extent Dr. Cave based her testimony on work she completed after the City's deposition had been completed. The City claims prejudice because Dr. Cave was the only expert to testify that Amanda suffered permanent cognitive impairment from the near-drowning accident.

27. We see no basis for the City's claim of unfair surprise with regard to this testimony, and we conclude that the trial court's ruling was well within its discretion. The admission of expert testimony is within the sound discretion of the court and its decision will not be overturned unless an abuse of discretion is shown. *Sanchez v. Molycorp, Inc.,* 103 N.M. 148, 152, 703 P.2d 925, 929 (Ct.App.1985). The factual circumstances of this case are different from those in *Khalsa* in which the expert was an undisclosed witness and opposing counsel was not given an adequate opportunity to depose him. *Khalsa,* 107 N.M. at 35, 751 P.2d at 719. Similarly, in *Shamalon,* the basis for the expert opinion had not been disclosed three weeks before trial despite the efforts of opposing counsel to obtain that information. *Shamalon,* 111 N.M. at 715, 809 P.2d at 629.

28. In contrast, in this case the teacher depositions and supporting documentation were known to the City. The City had provided its own expert clinical psychologist with some of the same information. The teacher depositions served to buttress Dr. Cave's opinion concerning Amanda's learning deficits and their cause; her opinion had not changed from deposition to trial. Moreover, the City neglected to propound any interrogatories directed at Dr. Cave's testimony, *see* NMRA 1996, 1–026(B), nor did the City seek to reconvene Dr. Cave's deposition at a time closer to trial when she would have completed her trial preparation. Therefore, even if the City were better able to sustain a claim of surprise and prejudice, the. City cannot complain about unfairness when it did not take all the measures reasonably available to protect itself as a litigant.

29. The City also challenges certain aspects of the testimony of Ms. Kimberly Hart, an aquatics safety expert, raising issues of relevancy and competence. First, Ms. Hart was allowed to render an opinion that the method of CPR used by a city lifeguard was improper for a child of Amanda's age and

size. Second, she testified about the state regulations governing the placement of a safety line in the swimming pool. The City claims error and prejudice and asks for a reversal of the judgment.

■ 30. The opinion concerning CPR was well within Ms. Hart's area of expertise. Nevertheless, Plaintiffs had not pled or notified the City of any theory of negligence or causation based upon faulty CPR, and the trial court properly sustained an objection on that ground. Plaintiffs, however, were allowed to proceed with the testimony insofar as it impeached the earlier testimony of another City lifeguard regarding what he observed on the day in question, including the CPR administered to Amanda.

31. The City contends that the Hart testimony was irrelevant, and in our view the point may be well taken. This Court has not been directed to any portion of the record where the lifeguard who testified for the City supposedly opined that the CPR was properly administered, and therefore it is difficult to see how Plaintiffs could use Ms. Hart to impeach a point not taken. However, under NMRA 1996, 1–061, the City must show more than error; the City must show that admission of evidence, even if erroneous, affects "the substantial rights of the parties" and "substantial justice." Plaintiffs were not allowed to argue to the jury any theory of negligence based upon negligent CPR and there was no reference to CPR in any of the jury instructions either as to fault or damages. Even if the admission of the CPR evidence was erroneous, it was merely cumulative of separate, substantial evidence which demonstrated the City's negligence. Therefore, "we conclude that there was more than ample evidence to support the jury verdict; the [testimony] was cumulative evidence and, on this issue, its admission was harmless error." *Gallegos v. Citizens Ins. Agency,* 108 N.M. 722, 734, 779 P.2d 99, 111 (1989).

■ 32. The City also challenges Ms. Hart's testimony concerning the placement of a deep-end safety line. She was allowed, without objection, to refer to the particular state regulations pertaining to the safety line placement and to compare those regulations with the placement at the swimming pool in Santa Fe. However, when it came time for her to give an opinion as to whether the placement was in conflict with national standards and state law, the City's objection was sustained. Therefore, the trial court gave the City the relief requested. The City did not request any limiting instruction nor that the jury be instructed to disregard anything said earlier. Earlier objections to the proposed Hart testimony were based upon lack of foundation and expert qualification, and they were properly overruled. When the City objected to Ms. Hart's qualifications for the line of questioning at issue, the objection was sustained. We see no error in the trial court's ruling. Further, we see no prejudice to the City. Ms. Hart conceded on cross-examination that the safety line placement bore no causation to this accident. The matter was not included in any jury instruction. It is again cumulative evidence, and the error, if any, was harmless.

CONCLUSION

33. The judgment of the trial court based upon the jury verdict is hereby affirmed.

34. IT IS SO ORDERED.

ALARID, J., concurs.

DONNELLY, J., specially concurring.

DONNELLY, Judge (Specially Concurring).

1. I concur in the result of the foregoing opinion and affirmance of the district court's decision that there was a waiver of immunity under Section 41–4–6 based on the City's failure to provide adequate lifeguard protection, resulting in serious injury to Amanda Leithead. I write separately, however, to emphasize that, in my opinion, the evidence supports Plaintiffs' recovery under a waiver of immunity in this case based on facts evidencing the existence of the City's negligent "operation" of the pool. The facts, however, do not establish a waiver of immunity based on the negligent "maintenance" prong of Section 41–4–6.

2. Determination of whether governmental immunity bars a tort claim against a public entity is a question of law. *Hendricks*

*ex rel. Martens v. Weld County Sch. Dist. No. 6,* 895 P.2d 1120, 1123 (Colo.Ct.App. 1995); *Jones–Clark v. Severe,* 118 Or.App. 270, 846 P.2d 1197, 1199 (1992); *see also Hern v. Crist,* 105 N.M. 645, 647–48, 735 P.2d 1151, 1153–54 (Ct.App.1987). If a claim is found to come within a waiver of immunity under the Tort Claims Act, the issue of negligence liability of the public body is determined in the same manner as if the public body were a private individual. *Jones–Clark,* 846 P.2d at 1199.

3. Section 41–4–6 waives immunity for negligence in the "operation *or* maintenance of any building, public park, machinery, equipment or furnishings." (Emphasis added.) The words "operation" and "maintenance" are not synonymous and each word should be read separately. Unfortunately, many New Mexico cases gloss over any clear distinction between the two terms. In ascertaining whether there has been a waiver of immunity under the Tort Claims Act, we must determine and give effect to the intent of the legislature when interpreting statutes. *Cummings v. X–Ray Assocs.,* 121 N.M. 821, 834, 918 P.2d 1321, 1334 (1996). "The legislature is presumed to have used no surplus words," *Weiland v. Vigil,* 90 N.M. 148, 152, 560 P.2d 939, 943 (Ct.App.1977); "each word is to be given meaning." *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 355, 871 P.2d 1352, 1361 (1994). In determining the legislative intent, we adopt the natural, common meaning of language in a statute unless a statutory definition controls or the context suggests a special or technical meaning. *See Levario v. Ysidro Villareal Labor Agency,* 120 N.M. 734, 736, 906 P.2d 266, 268 (Ct.App. 1995).

4. "Maintenance is [generally defined as] the up-keep or preservation of the condition of the property, including the cost of ordinary repairs necessary and proper from time to time for that purpose." *Bogan v. Postlewait,* 130 Ill.App.2d 729, 265 N.E.2d 195, 197 (1970). In contrast, "operation" relates to the manner of doing or performing work. *State Farm Fire & Cas. Co. v. Geary,* 699 F.Supp. 756, 761 (N.D.Cal.1987). "Operation" also has been defined as "the process of operating or mode of action; an effect brought about in accordance with a definite plan; action; activity." *Black's Law Dictionary* 1092 (6th ed.1990). *See also Gallegos v. School Dist. of W. Las Vegas,* 115 N.M. 779, 781, 858 P.2d 867, 869 (Ct.App.1993) (holding "operation" of a school bus included driver's decision about where to park the bus because driver was in control of the bus and his decision affected the manner in which he performed his driving duties); *Gallegos v. Trujillo,* 114 N.M. 435, 439, 839 P.2d 645, 649 (Ct.App.1992) (narrowly construing "operation" as used in the Tort Claims Act). Although noting a preference for the "broader view" of the applicability of Section 41–4–6 in *Bober v. New Mexico State Fair,* 111 N.M. 644, 653, 808 P.2d 614, 623 (1991), our Supreme Court nevertheless found that a distinction in fact exists between the terms "operation" and "maintenance" ("[L]iability is predicated not only on 'maintenance' of a piece of publicly owned property ... but it also arises from the 'operation' of any such property.").

5. In the case at bar, the lifeguards' failure to provide adequate protection to pool patrons and Amanda came within the ambit of negligent *operation* of the municipal pool. Proper operation of the pool includes enforcing safety rules and following prescribed rotation and scanning procedures. Here, there was no evidence which would support a determination that there was a physical defect in the municipal facilities which would give rise to a waiver of sovereign immunity pursuant to the negligent maintenance prong of Section 41–4–6. Thus, I concur in affirmance of the judgment entered below based solely on Plaintiffs' proof of negligent operation of the facility.