The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: January 22, 2024

**No. A-1-CA-39871**

**RICHARD VANHORN, SR., as Parent**
**and Next Friend of Richard Vanhorn, JR.,**

      Plaintiff-Appellant,

v.

**CARLSBAD MUNICIPAL SCHOOL**
**DISTRICT and CARLSBAD MUNICIPAL**
**SCHOOL BOARD,**

      Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Eileen P. Riordan, District Court Judge**

Ragsdale Law Firm
Luke W. Ragsdale
Kay C. Jenkins
Roswell, NM

for Appellant

German Burnette & Associates, LLC
Jason M. Burnette
Alexander W. Tucker
Albuquerque, NM

for Appellees

**OPINION**

**BOGARDUS, Judge.**

{1}     In this case, we consider whether the personal injury claim brought by Richard Vanhorn Sr., as next friend of his minor child Richard Jr. (Child) (collectively, Plaintiffs), against Carlsbad Municipal School District and Carlsbad Municipal School Board (collectively, Defendants) falls under the waiver of immunity (the building waiver) found in the New Mexico Tort Claims Act (TCA), NMSA 1978, §§ 41-4-1 to -27 (1976, amended 2020). The district court granted Defendants' motion for summary judgment which argued that Plaintiffs' "claims amount to a claim of negligent supervision, for which there is no [TCA] waiver." Plaintiffs argue that Defendants' failure to follow school policy created a dangerous condition in the operation of the school and caused Child's injury, and therefore Section 41-4-6 waived Defendants' immunity. We agree with Plaintiffs and therefore reverse.

**BACKGROUND**

{2}     This case arises from injury suffered by Child on January 8, 2019, after post-hip surgery on December 17, 2018. Richard Sr. provided the school two separate doctor's notes prohibiting his son from participating in any sports or physical education. Approximately three weeks after surgery, Child returned to Ocotillo Elementary School. On Child's first day back, his homeroom teacher allowed him to go outside during the recess break and instructed him to sit on a bench. The

homeroom teacher was not outside with Child and failed to inform teachers on recess duty of his physical restrictions. Child eventually left the bench to play football with his peers, which lead to a fall and a serious injury to his recently operated-on hip. The teachers on recess duty swiftly attended to him and radioed in the injury. The school nurse checked him as the principal called 911. Because of his injury, an ambulance transported Child to a hospital for medical treatment. Plaintiffs sued for personal injury, alleging negligence by Defendants.

{3}     Additional details about school policies and procedures for injured students were revealed during the depositions of the school principal and school nurse. The school principal and nurse testified that it was the school's recommendation and unwritten policy for students under a doctor's order restricting physical activity to remain inside during recess. Further, school procedures required the nurse to make copies of all doctor's notes and provide them to all school faculty that interact with the student. Richard Sr. stated that he provided two separate notes to the school—the first to "the secretary in the front" and the second to Child's homeroom teacher. The school nurse testified that she circulated only one of the doctor's notes because both notes stated the same restrictions. However, the homeroom teacher did not receive a copy of the note from the nurse. Instead, the homeroom teacher was aware of the surgery and Child's medical restrictions only because Richard Sr. had provided the note and discussed with her the need to make accommodations.

{4} Defendants filed a motion for summary judgment, arguing that Plaintiffs' claim amounts to negligent supervision, which is not waived by the TCA. The district court agreed and dismissed the case with prejudice.

**DISCUSSION**

{5} We review the district court's grant of summary judgment de novo. *Zamora v. St. Vincent Hosp.*, 2014-NMSC-035, ¶ 9, 335 P.3d 1243. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 6, 310 P.3d 611 (internal quotation marks and citation omitted). In reviewing a motion for summary judgment, we "view the facts in a light most favorable to the party opposing summary judgment and draw all reasonable inferences in support of a trial on the merits." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 7, 148 N.M. 713, 242 P.3d 280 (internal quotation marks and citation omitted). Courts in New Mexico view summary judgment with disfavor, and consider it "a drastic remedy to be used with great caution." *Madrid v. Brinker Rest. Corp.*, 2016-NMSC-003, ¶ 16, 363 P.3d 1197 (internal quotation marks and citation omitted).

{6} As government entities, Defendants have blanket immunity from suit, except as waived by Sections 41-4-5 through 41-4-12 of the TCA. *See Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, ¶ 8, 140 N.M. 205, 141 P.3d 1259 ("The TCA grants

all government entities and their employees general immunity from actions in tort, but waives that immunity in certain specified circumstances."). In this case, Plaintiffs' allegations implicate the building waiver of Section 41-4-6(A) which allows suits for "bodily injury . . . caused by the negligence of public employees . . . in the operation or maintenance of any building, public park, machinery, equipment or furnishings." "For the waiver to apply, the negligent 'operation or maintenance' must create a dangerous condition that threatens the general public or a class of users of the building." *Upton*, 2006-NMSC-040, ¶ 8. Further, "[t]he waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building." *Id.* ¶ 9.

{7}     In contrast, "a claim of negligent supervision, standing alone, is not sufficient to bring a cause of action within the waiver of immunity created by Section 41-4-6." *Leithead v. City of Santa Fe*, 1997-NMCA-041, ¶ 8, 123 N.M. 353, 940 P.2d 459. To determine whether a claim falls within the building waiver or is instead a stand-alone negligent supervision claim, we must examine the specific facts alleged. *Gebler v. Valencia Reg'l Emergency Commc'n Ctr.*, 2023-NMCA-70, ¶ 16, 535 P.3d 763 ("Our task is to determine where [the p]laintiff's action lies on the spectrum."). We thus turn to relevant cases that have analyzed Section 41-4-6 as it relates to public schools to determine whether the building waiver applies in this case.

{8} Our Supreme Court addressed the building waiver in the context of public schools in *Upton*, 2006-NMSC-040, ¶¶ 10, 26 (reversing summary judgment because the school district's negligence created a dangerous condition for the child). The *Upton* Court agreed with the plaintiff that Section 41-4-6 waived immunity based on the defendant "negligently put[ting] in motion a chain of events that both preceded and followed the specific decisions" causing the death of the child. *Upton*, 2006-NMSC-040, ¶ 18. This chain of events began with a substitute teacher requiring the child to participate in a high level of exercise—contrary to her special medical needs—and ended with school personnel failing to respond appropriately to her condition of acute distress. *Id.* ¶ 1. The Court emphasized that "a school simply cannot operate in a safe, reasonable, and prudent manner without affording, at the very least, the health and safety services that students have been promised, and upon which parents have relied." *Id.* ¶ 13. Such "[s]afety procedures are particularly vital for those students known to have special needs and special risks." *Id.* By failing to comply with school protocols and assurances, the *Upton* Court concluded the defendants created a dangerous condition. *Id.* Such dangerous conditions not only endangered the deceased child in that case, but made "it more likely that all similarly situated students were at risk as well." *Id.* ¶ 24. Accordingly, our Supreme Court held that the plaintiffs had "stated a claim which, if proven, constitutes negligence

5

in the operation or maintenance of a building within the waiver of tort immunity set forth in Section 41-4-6." *Id.* ¶ 25.

{9}     Approximately seven years after *Upton*, our Supreme Court dealt with a case, *Encinias*, 2013-NMSC-045, ¶ 2, alleging student-on-student violence close by school grounds. In *Encinias*, our Supreme Court held that the plaintiff "established a genuine issue of material fact as to whether there was a dangerous condition on the premises of the high school." *Id.* ¶ 18. The holding was based on statements by the assistant principal that the area where the attack occurred was a "hot zone" for student violence. *Id.* According to the *Encinias* Court, such statement, taken alone, would not "support a finding of liability, but it is enough to raise questions about the degree of student violence and the school's efforts to discover and prevent student violence in that area." *Id.* (emphasis omitted). Additionally, the plaintiff introduced evidence that the area was not monitored by security cameras, and that the security and teachers assigned to monitor the area were not present at the time of the attack. *Id.* As such, "the lack of security measures could indicate that the school failed to address the problem." *Id.* Our Supreme Court concluded that the plaintiff "established the existence of a genuine issue of material fact regarding the presence of a dangerous condition at the school, and summary judgment . . . is therefore inappropriate." *Id.*

{10} Next, in *Kreutzer v. Aldo Leopold High Sch.*, 2018-NMCA-005, ¶¶ 49, 55, 409 P.3d 930, this Court determined that the building waiver did not apply in a case where a student was assaulted and beaten by a fellow student in the school parking lot. This Court emphasized that there was no evidence or even an allegation that the parking lot was a "hot zone" for student violence. *Id.* ¶ 61. The *Kreutzer* plaintiffs failed to provide any "competent evidence of the existence of a dangerous condition in the school parking lot or that [the defendant] knew or should have known that the parking lot was unsafe," or provide evidence that "[the defendant] knew or should have known that [the aggressor] had a propensity for violence or posed a threat to [the victim] (or to anyone at the school)." *Id.* ¶ 62. Without such evidence, the plaintiff could not demonstrate a "genuine issue of material fact as to whether there was a dangerous condition that the school might reasonably have discovered and mitigated in the exercise of ordinary care." *Id.*

{11} Moreover, the plaintiffs presented a general proposition that "parking lots can be dangerous" because of "the nature of heavy foot and vehicle traffic at certain times of the day" and "the combination of ease of access and lack of natural surveillance in many parking lots." *Id.* ¶ 63 (alteration and internal quotation marks omitted). The plaintiffs, however, failed to make a connection between this "general proposition" and "the condition of the [school] parking lot at the time of the incident." *Id.* "In fact, [the p]laintiffs offered no evidence that any of the purported

7

failures identified by [an expert] made the parking lot unsafe or that implementation of any of the measures he discussed would have prevented the assault." *Id.* Accordingly, this Court held that, "[a]s a matter of law, [the p]laintiffs [had] not established that Section 41-4-6(A) waive[d] immunity for their claim against [the defendant]." *Id.* ¶ 65.

{12} The difference in outcome between *Encinias*, 2013-NMSC-045, ¶ 18 (holding that an attack of a student in a "hot zone" raises a genuine issue of material fact regarding the presence of a dangerous condition at the school), and *Kreutzer*, 2018-NMCA-005, ¶ 62 (holding that an attack of a student in a school parking lot, without more, does not create a dangerous condition at the school), exemplifies the difficulty with applying the operational aspect of Section 41-4-6. This Court sought to clarify this difficulty in *Gebler*, 2023-NMCA-70, ¶ 16.

{13} Acknowledging that the expansion of Section 41-4-6 to operations of a building has complicated its application, this Court recently laid out a building waiver operational spectrum to guide courts in their determination. *See Gebler*, 2023-NMCA-70, ¶ 16 ("[R]eference to operations also set the stage for a series of difficult, sometimes contradictory, cases—some concluding that Section 41-4-6 applies to allow an action to continue; some refusing to find Section 41-4-6 applicable. Our task is to determine where [the p]laintiff's action lies on the spectrum."). On one end of the spectrum is an isolated negligent action that injures

a single individual. *See Archibeque v. Moya*, 1993-NMSC-079, ¶¶ 8, 11, 116 N.M. 616, 866 P.2d 344 (holding that negligently performing one administrative function "associated with the operation of the corrections system" which results in "risk of harm for a single individual" does not fall under the building waiver); *see also Espinoza v. Town of Taos*, 1995-NMSC-070, ¶ 14, 120 N.M. 680, 905 P.2d 718 (concluding that Section 41-4-6 does not waive immunity for negligent supervision resulting in injuries to one child). On the other end are negligent operational failures that create an unsafe or dangerous condition for a larger population than just the plaintiff. *See Leithead*, 1997-NMCA-041, ¶ 12 (holding that "when [the defendant's] lifeguards did not adequately perform duties that were essential to public safety, they negligently operated the swimming pool and thereby created a condition on the premises that was dangerous to [the plaintiff] and the general public"); *see also Upton*, 2006-NMSC-040, ¶ 13 (concluding that the school's failure to follow procedures established for at-risk students created a dangerous condition for all at-risk students).

{14} In laying out this spectrum, the Court provided two factual scenarios demonstrating when "the 'operations' aspect of Section 41-4-6 will apply." *Gebler*, 2023-NMCA-70, ¶ 26. "First, an operational failure to respond to or discover conditions which can pose a danger to a class of persons involved in or affected by an activity on the property." *Id.* "Second, a failure to create and/or to

implement reasonably appropriate safety policies and operational procedures to make public properties safe for the public who use them." *Id.* These two scenarios are not mutually exclusive and the facts alleged by a plaintiff can include characteristics of both. *Id.* Here, Plaintiffs alleged facts that fall into the second scenario.

{15}     Plaintiffs provided sufficient evidence to raise a genuine issue of material fact regarding whether Defendants created a dangerous condition for physically restricted students by failing to implement their safety policies and operational procedures. In their depositions, the school principal and nurse testified that the school had operational procedures and unwritten policies addressing the process of supervising medically restricted students. The process started with the nurse receiving the medical note and making copies to ensure that all school faculty who interacted with the student were aware of the limitations. Next, school policy did not allow medically restricted students to be outside during recess.

{16}     However, the depositions here indicate that these procedures might not have been properly implemented. First, the homeroom teacher did not receive the medical note from the nurse. This leads to the reasonable inference that there was a breakdown in implementing the schools safety procedures and other faculty— including teachers on recess duty—also failed to receive the medical note. *See Romero*, 2010-NMSC-035, ¶ 7 (stating that we must "draw all reasonable inferences

10

in support of a trial on the merits" (internal quotation marks and citation omitted)). Further, the homeroom teacher directly contradicted school policy by allowing Child to go outside during recess despite knowing he was medically restricted. Finally, none of the teachers on recess duty were aware of Child's limitations because they did not receive a copy of the medical note and/or the homeroom teacher failed to inform them. A reasonable jury could conclude from this evidence that operational failures at the school created a dangerous condition for Child. *See Kreutzer*, 2018-NMCA-005, ¶ 52 ("Section 41-4-6(A), broadly interpreted, waives immunity only where the alleged negligence creates an unsafe, dangerous, or defective condition on property owned and operated by the government." (internal quotation marks and citation omitted))

{17}     This conclusion by the jury that Defendants were liable for such operational failures may be sufficiently supported by the school's failure to follow their own safety policies. *See Upton*, 2006-NMSC-040, ¶ 9 ("The waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building.").

{18}     Defendants argue that this is a case of a single failure to communicate. We disagree. Defendants potentially created a dangerous condition by failing to follow their safety policies at multiple junctures of the process, resulting in Child being left unsupervised in an active school playground during recess. *See Encinias*, 2013-

11

NMSC-045, ¶ 11 (stating that the defendant's dangerous "condition could take many forms" and listing cases where a dangerous condition was created). Although a claim of negligent supervision standing alone is not waived by Section 41-4-6, *Leithead*, 1997-NMCA-041, ¶ 8, a Section 41-4-6 claim "may include proof of negligent acts of employee supervision that is part of the operation of the building." *Upton*, 2006-NMSC-040, ¶ 16. In this case the negligent supervision is not the claim in and of itself; rather, it is the result of the operational failure to follow school policies and procedures by not keeping Child inside and failing to inform all relevant parties of his physical limitations.

{19}     Defendants rely on *Espinoza*, for their contention that Plaintiffs' claims are for negligent supervision. *See* 1995-NMSC-070, ¶ 14 (determining that Section 41-4-6 did not apply because the playground where the incident occur was not a condition requiring supervision). The facts considered in *Espinoza* are distinguishable from the facts alleged by Plaintiffs. The victim in *Espinoza* fell from the top of a slide while the two employees watching after the children were inattentive. *Id.* ¶ 3. Moreover, there were no defects on the slide and the victim did not have any physical restrictions. *See id.* ¶ 14. Our Supreme Court clarified that according to those facts, "the negligent conduct itself did not create the unsafe conditions." *Id*. That is not the case here. Defendants' potentially negligent conduct created an unsafe condition by leaving Child unsupervised in the schoolyard

12

contrary to school procedure. While the schoolyard itself might not be dangerous, viewing the facts in a light most favorable to Plaintiffs, *see Romero*, 2010-NMSC-035, ¶ 7, a reasonable jury could find that the school environment was inherently dangerous for Child and other physically restricted students. Defendants' multiple failures here to follow policy resulted in Child participating in physical activities contrary to his medical limitations. Further, a reasonable jury could conclude that Child did not have the maturity to appreciate the potential risks of his behavior and that Defendants should have reasonably known that leaving him outside contrary to school policy could result in his injuries. Ultimately, Child was part of a category of students the school knew were vulnerable and had established policies to protect, which distinguishes this case from *Espinoza*.

**{20}** Defendants further contend that *Kreutzer* controls our analysis because Plaintiffs' claim "truly relates to supervision and failure to prevent [Child] from joining his friends to play at recess—or a claim of negligent supervision." *See* 2018-NMCA-005, ¶ 57. We disagree. In *Kreutzer*, this Court concluded that the plaintiffs failed to proffer evidence that the parking lot where victim's attack occurred was inherently dangerous. *Id.* ¶ 61. Instead, the *Kreutzer* plaintiffs' argument relied on the defendant's lack of written policy concerning supervision in the parking lot. *Id.* ¶ 56. However, the plaintiffs cited no authority requiring the school to have such policies and provided no evidence that such policies would have fix the alleged

dangerous condition. *Id.* ¶¶ 56, 63. In our case, Plaintiffs provided deposition testimony by the school principal where he admits that it was dangerous to have Child outside during recess. This testimony distinguishes our case from *Kreutzer*, where this Court highlighted the importance of the plaintiffs failing to adduce competent evidence that the parking lot was unsafe. *Id.* ¶ 62. Such evidence that the school knew or should have known that their failure to follow policies created a condition that was inherently dangerous to physically limited students renders this case closer to *Leithead*, 1997-NMCA-041, ¶ 12 (concluding that the defendants failed to perform duties essential to the public safety and therefore created a dangerous condition).

{21}     The defendants in *Leithead* failed to communicate and implement swimming pool regulations that required adult supervision for young children, resulting in the injuries to the victim. 1997-NMCA-041, ¶¶ 2-3. This Court concluded that the defendants "did not adequately perform duties that were essential to public safety" and, therefore, such negligent operation created a condition on the premises that was dangerous to the victim and the general public. *Id.* ¶ 12. This Court's "focus [was] on the creation of a dangerous condition on building and property owned and operated by the government, which is quintessentially a situation for which immunity is waived under the [TCA]." *Id.* The alleged facts here are similar to the facts in *Leithead* because Defendants failed to communicate the school policy and

Child's condition to his supervising teachers and, therefore, violated school policy that required students under a medical note to stay inside. This violation of school policy created a condition on the premises that was dangerous to Child and other medically limited students. Although we recognize that "'a school building is not as inherently dangerous as a swimming pool,'" *Kreutzer*, 2018-NMCA-005, ¶ 77 (alteration omitted) (quoting *Upton*, 2006-NMSC-040, ¶ 19), the dangers inherent in a school environment may depend on the special needs of students. *See Upton*, 2006-NMSC-040, ¶¶ 13, 14 (explaining that a school's safety procedures in place for students with special needs are particularly vital for those students). By failing to follow policy resulting in leaving Child—a student with medical restrictions— outside unsupervised, Defendants essentially turned the playground into an injury-prone environment for physically limited students.

{22}     Our Supreme Court allowed a Section 41-4-6 claim to move forward against a school where an assistant principal testified that the area where the incident occurred was a "hot zone" for student violence. *See Encinias*, 2013-NMSC-045, ¶ 18. The Court reasoned that while the testimony in itself might not be enough to support liability, it did provide evidence that the school allowed a dangerous condition on the premise. *Id.* ¶ 14. In our case, while there is not a pattern of injuries, the principal testified that leaving Child outside was dangerous. A conclusion that Defendant created a dangerous condition may be presumed from the reasonable

15

proposition that a student who is limited by medical restrictions is likely to be injured if left outside unsupervised. Such was the case here. Plaintiffs presented evidence that Defendants' failure to follow their policies and procedures was the direct cause of leaving Child unsupervised in the school playground. *See Kreutzer*, 2018-NMCA-005, ¶ 63 (explaining that the plaintiffs failed to provide evidence that the defendant's failure to follow policy created the dangerous condition and therefore failed to establish that the defendant's failure was the direct cause of the injury). This evidence raises material questions regarding whether Defendant created a dangerous condition through its operational failures.

{23} We further emphasize the instances where Defendants could be seen to have acted negligently. First, at least one faculty member (Child's homeroom teacher) required to receive a copy of the medical note did not. Second, the homeroom teacher allowed Child to go outside during recess contrary to school policy. And third, neither the homeroom teacher nor the school nurse notified the teachers on recess duty of Child's limitations. Each potentially negligent act is important because together they demonstrate that this is not a claim for a single instance of negligent supervision. Instead, Defendants potentially failed to operate the school in "a safe, reasonable, and prudent manner without affording . . . the health and safety services that students have been promised, and upon which parents have relied." *Upton*, 2006-NMSC-040, ¶ 13. Richard Sr. had a reasonable expectation that the school

16

would accommodate his son's recovery by ensuring that he would not participate in physical activities. Richard Sr. provided two separate medical notes to the school and had a conversation with the homeroom teacher regarding Child's accommodations. By doing his best to provide the medical information to the school, Richard Sr. could reasonable rely on the school's internal policies and procedures to ensure that they protected Child. *See id.* ¶ 14 ("The procedures in place for students with special needs . . . are akin to other measures that are important for the safe operation of any school building.")

{24}     Defendants argue that the set of facts presented do not fall under the "building exception" because Child's injury was a single isolated incident. However, our Supreme Court has clarified that it is common for only one person to be injured in Section 41-4-6 claim; the main concern is whether "the risk posed was to a group of people using the park or building." *Upton*, 2006-NMSC-040, ¶ 24. Indifference to a student's special medical needs make it more likely that all similarly situated students were at risk as well. *See id.* Such was the case here. Although Child was the only student injured, Defendants' pattern of negligence through the course of their actions increased the likelihood that other students who are also physically limited may face a similar situation that injures them. Consequently, "[t]he school's failures, if proven, created a dangerous condition for all special-needs children." *Id.*

17

{25} Returning to the building waiver operation spectrum laid out in *Gebler*, 2023-NMCA-70, ¶ 16, our analysis of the alleged facts and relevant case law shows that Defendants' actions are not a single isolated negligent decision. Instead, it is a pattern of actions by multiple actors that violated established school policy and contravened the Defendant's responsibility to ensure that all school faculty interacting with the Child were aware of his physical limitations. Moreover, such a pattern of school policy violations potentially create a dangerous condition for all students who are physically limited. Accordingly, viewing the facts in the light most favorable to Plaintiffs and drawing all inferences in support of a trial, *see Romero*, 2010-NMSC-035, ¶ 7, we conclude that there are genuine issues of material fact as to whether Defendants' actions created an operational failure in its policies and procedure pursuant to the building waiver of the TCA. Therefore, we reverse the district court's grant of Defendants' motion for summary judgment.

**CONCLUSION**

{26} For the foregoing reasons, we reverse.

{27} **IT IS SO ORDERED.**

_____
**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

_____
**JACQUELINE R. MEDINA, Judge**


_____
**ZACHARY A. IVES, Judge**