IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2018-NMCA-005

Filing Date: August 7, 2017

Docket No. A-1-CA-35286

LORI KREUTZER and
MARCELLE CARUSO,

      Plaintiffs-Appellants,

v.

ALDO LEOPOLD HIGH SCHOOL,

      Defendant-Appellee,

and

NISHA MILLIGAN, BARBARA JIMENEZ,
and SAFECO INSURANCE COMPANY OF
AMERICA,

      Defendants.

APPEAL FROM THE DISTRICT COURT OF GRANT COUNTY
Jennifer E. Delaney, District Judge

Law Office of Christopher D. Lee, LLC
Christopher D. Lee
Albuquerque, NM

for Appellants

Narvaez Law Firm, P.A.
Henry F. Narvaez
Albuquerque, NM

for Appellee

## OPINION

**VANZI, Chief Judge.**

**{1}** This appeal requires us to answer two questions of law. The first question, one of first impression, is whether defendant Aldo Leopold High School (ALHS), a charter school in Grant County, New Mexico, is a public school and therefore subject to the protections afforded to governmental entities by the New Mexico Tort Claims Act (the TCA), NMSA 1978, §§ 41-4-1 to -30 (1976, as amended through 2015). The second question is whether the negligence claim asserted against ALHS in this case falls within Section 41-4-6(A) of the TCA, an exception to the TCA's general rule of governmental immunity from tort liability. In the proceedings below, ALHS argued in separate motions that it is entitled to summary judgment because, as a matter of law, (1) ALHS is a public school protected by the TCA, and (2) Plaintiffs' negligence claim does not fall within the waiver of TCA immunity provided by Section 41-4-6(A). The district court granted both motions. We affirm both orders.

## FACTUAL BACKGROUND

**{2}** At the end of the school day on March 1, 2012, Marcelle Caruso was walking to her car in the ALHS student parking lot when she was assaulted and beaten by fellow ALHS student Nisha Milligan. Nisha had been sitting in a friend's car in the school parking lot waiting for Marcelle, and when Marcelle came out of the school building, Nisha walked across the parking lot, called Marcelle's name, and began beating her. Nisha knocked Marcelle to the ground and continued to beat her, causing serious injuries, including a torn right anterior-cruciate ligament that required surgical reconstruction and painful rehabilitation.[1]

**{3}** Nisha later said she did this because she was angry with Marcelle for bumping her in the hall that day and for laughing at her at an earlier time she could not recall. Nisha did not report to any ALHS teacher or staff member that Marcelle had laughed at her. Marcelle testified that before March 1, 2012, she had never been threatened by anyone at ALHS, including Nisha, and was never afraid for her safety at school.

**{4}** ALHS Director Eric Ahner testified that Nisha told him after the incident that Marcelle "was talking badly about her" and "was giving her bad looks," but that before the incident, he had no information that Marcelle had ever bullied or harassed Nisha, and that he had seen "no indications whatsoever of any propensity of [Nisha] being violent or physical with anybody, student or staff." During the three years she attended ALHS, Nisha had no altercations with other students. Ahner stated in an affidavit that there were no student-on-student altercations in the ALHS parking lot in the seven years between the school's inception in 2005 and the March 1, 2012 assault.

---

[1]Plaintiffs call the incident a "prolonged beating" but cites no evidence establishing the duration of the assault.

**{5}**   When the assault took place, ALHS had written policies prohibiting student behavior including belligerence, fighting, bullying, harassment, and conduct in violation of state and federal law but no written policies specifically relating to supervision of the parking lot or to prevention of student-on-student altercations. Training is conducted for staff members, and staff meetings held at the beginning of each school year devote significant time to basic safety within the school and to such safety-related matters as CPR training, fire drills, managing behavior, recognizing and de-escalating conflicts between students, handling altercations, and other aspects of student supervision. Each year, ALHS staff and students develop a set of "school norms." ALHS has also conducted formal training with students to address issues such as conflict resolution.

**{6}**   ALHS faculty and staff are given assignments each year, including supervising the student parking lot after school. In addition to the training all staff members receive at the beginning of the school year, the individual assigned to supervise the parking lot receives training concerning traffic issues such as speed limits, keeping students away from traffic, and where students may park, as well as about applying the same principles of child safety, including handling student-on-student altercations, outside the school building as are applied inside.

**{7}**   Judy Runnels was assigned to monitor the student parking lot in 2012. Although she was at ALHS and on monitoring duty March 1, 2012, she was not in the parking lot at the time of the assault but was in the bathroom. At the end of classes that afternoon, Runnels left the classroom where she had been teaching, walked down the hall, dropped off her books in another classroom, stopped to use the bathroom, and went outside through the school's main entrance. When she arrived in the parking lot, the incident between Nisha and Marcelle was over and there was no sign that anything had happened. It was not until she went back into the building after her monitoring shift ended that Runnels heard about the fight.[2]

**{8}**   Ahner commenced an investigation as soon as he learned of the incident. He disciplined Nisha and removed her from the general population at school by assigning her an "interim alternative educational placement." Nisha did not graduate from ALHS. Marcelle missed three months of school as a result of her injuries, stopped participating in dance, and eventually moved to New Jersey.

**PROCEDURAL BACKGROUND**

**{9}**   In July 2013 Lori Kreutzer, as next friend of her minor child Marcelle (collectively, Plaintiffs), filed suit against ALHS and others. Against ALHS, Plaintiffs assert a negligence claim based on allegations that ALHS "owed a duty to Marcelle . . . to use ordinary care to

---

[2]Plaintiffs assert that Runnels "could not account for her whereabouts" at the time of the incident; however, at her deposition, Runnels recounted where she went and what she did between the end of classes and her arrival in the parking lot.

keep the premises of its school safe, including the parking lot" and breached that duty "by failing to take reasonable precautions to keep the school safe" and "by failing to provide adequate security or supervision in the school parking lot[.]" The complaint does not identify a dangerous condition existing in the school parking lot, or allege that ALHS knew or should have known that the parking lot was unsafe, or that ALHS knew or should have known that Nisha had a propensity for violence or posed a threat to Marcelle.

{10}    The complaint alleged that ALHS is "a privately operated charter school" and, therefore, "does not fall within the scope of" the TCA, but that the immunity afforded to government entities by the TCA is waived by Sections 41-4-4 and -6 "for [ALHS's] negligence and that of its employees in failing to properly maintain the school parking lot in a safe condition." In answering the complaint, ALHS stated that it is a charter school, as defined in the Charter Schools Act (the CSA), NMSA 1978, §§ 22-8B-1 to -17.1 (1999, as amended through 2015), and "is thus a public school . . . subject to the [TCA.]" ALHS also raised TCA-based affirmative defenses.

{11}    ALHS moved to dismiss under Rule 1-012(B)(6) NMRA, arguing that (1) ALHS is a charter school under the CSA and, thus, a public school subject to suit only if the TCA waives immunity for the claim asserted against it; (2) Plaintiffs do not allege a "pattern" of dangerous behavior or a dangerous condition on the premises, but only a single instance of negligent supervision, which does not fall within the Section 41-4-6(A) immunity waiver; and (3) the TCA bars Plaintiffs' claims for punitive damages and pre-judgment interest. Plaintiffs opposed the motion, arguing that nothing in the text of the TCA or CSA indicates that "the Legislature intended privately operated schools to be immune from tort liability," as the TCA does not mention "charter schools" and the CSA does not mention "immunity," and that ALHS had not shown that it met the definition of a charter school, or that a charter school is a public school entitled to TCA immunity. Plaintiffs also maintained that their argument was not that the act of violence alleged in the complaint, by itself, rendered the ALHS parking lot unsafe, but that "a dangerous condition existed on the premises, namely the absence of adequate security, supervision, or employee oversight to prevent student fights."

{12}    In its reply, ALHS countered that a charter school cannot exist unless it complies with the CSA's requirements and that charter schools are public schools subject to the TCA. As for Plaintiffs' contention that their claim falls within the Section 41-4-6(A) waiver, ALHS argued that Plaintiffs' claim is that the fight would not have occurred if there had been adequate supervision and that, as a matter of law, Section 41-4-6(A) does not waive immunity for claims of negligent supervision. The district court denied the motion to dismiss in an order that did not explain the basis for its decision.

{13}    ALHS subsequently moved for summary judgment on the issue of its status as a public school subject to the TCA. The motion attached the charter agreement and documents evidencing the New Mexico Public Education Commission's renewal of ALHS's state charter, noting that the district court had advised at the hearing on the motion to dismiss that

4

it could not determine whether ALHS was subject to the TCA without reviewing the charter agreement. Plaintiffs did not respond to this motion, and the district court granted it, ruling that ALHS "is a Public Charter School under the provisions of the [TCA.]"[3]

{14}     ALHS separately moved for summary judgment on the ground that, as a matter of law, Section 41-4-6(A) did not waive TCA immunity because Plaintiffs' claim is for negligent supervision, and precedent holds that Section 41-4-6(A) does not waive immunity for such claims. ALHS cited *Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, 310 P.3d 611, to support its argument that Section 41-4-6(A) does not waive immunity absent a dangerous condition on the premises, and this requirement cannot be met because "a single act of student-on-student violence does not render the premises unsafe," and there is no evidence of a pattern of violence in the parking lot. Plaintiffs also cannot establish waiver under *Upton v. Clovis Municipal School District*, 2006-NMSC-040, 140 N.M. 205, 141 P.3d 1259, ALHS contended, because *Upton* requires multiple safety policy failures, and there is no such evidence here. *See id.* ¶ 21.

{15}     In opposing the motion, Plaintiffs contended that their claim is not based on negligent supervision but on ALHS's failure to have an appropriate written policy for student safety in its parking lot and its failure on the day of the incident to follow an informal policy of having the parking lot monitored by a staff member. Plaintiffs emphasized that they do "not ask the [c]ourt to apply *Encinias* on its facts" and explicitly disclaimed reliance on a theory that "the high school parking lot was a 'hot zone' for violence, as in *Encinias*." Their argument relied principally on the general statement in *Encinias* that "the facts of a case will support a waiver under Section 41-4-6(A) if they would support a finding of liability against a private property owner[,]" *Encinias*, 2013-NMSC-045, ¶ 15, and the general statement in *Upton* that the waiver applies to "safety policies necessary to protect the people who use the building." *Upton*, 2006-NMSC-040, ¶ 9. They insisted that their claim is distinct from negligent supervision and is the type of claim *Upton* recognized as falling within Section 41-4-6(A), "namely, where public employees fail to have or follow safety policies that apply to those who use a public building."

{16}     Plaintiffs also submitted an affidavit of C. Joshua Villines, asserting that it established that "[t]he standard of care applicable to schools is that they have appropriate written policies in place for student safety" and that "ALHS failed to meet the standard of care in multiple ways." The affidavit declares that Villines is "an expert in school safety." The opinion attached to the affidavit (Opinion) indicates that he reviewed "crisis response and safety policies and procedures for the City Schools of Decatur, Georgia" and provided training for faculty concerning "crisis planning and response, workplace and school violence, and threat assessment." But neither the Opinion nor Villines' resume show any education or training specific to public school safety, public school parking lots, or the

---

[3]Based on this same reasoning, the district court later entered a stipulated order that punitive damages and pre-judgment interest are not available.

5

prevention of student-on-student altercations on public school premises. And Villines does not explain how credentials such as a board certification in "Security Management" by ASIS International or designation as an "International Crime Prevention Specialist" by the International Society of Crime Prevention Practitioners, or any other education or experience he cites, make him competent to testify as an expert concerning the standard of care for New Mexico public school parking lots related to student-on-student violence.

**{17}** Villines also offered no explanation or authority supporting his assumption that what he cites as "industry standards" define the standard of care New Mexico public schools must meet to address student-on-student violence in school parking lots. The titles of the texts he cites and the names of the organizations to which they are attributed suggest that the "industries" he relies on bear little or no relationship to public schools.[4] The Opinion does refer to schools and "educational setting," but it contains no specific discussion of spontaneous student altercations in public schools, only general statements with citations to texts that appear to address such issues as suicide prevention and "crisis plans" and "emergency response procedures" for catastrophic emergencies such as school shootings.

**{18}** Villines nevertheless opined that ALHS had failed to meet the standard of care by failing to: (1) "create written policies and procedures for the supervision of the parking lot"; (2) "have a capable guardian present in the parking lot at the time of the incident"; (3) "perform and maintain a security vulnerability assessment which included the parking lot"; (4) "provide adequate supervision of the personnel assigned to the parking lot, leading to the absence of the assigned faculty member at the time of the incident"; (5) "establish a written security plan that included the parking lot"; and (6) "establish a comprehensive formal threat assessment process for the centralized archival, assessment, documentation, and tracking of threatening or potentially violent behavior." Villines does not say that any of these failures created a dangerous condition in the ALHS parking lot that threatened the safety of those who used it, or that implementation of any measure he claimed is required by his proffered standard of care would have prevented Nisha's assault on Marcelle. Plaintiffs adduced no other evidence purportedly demonstrating the existence of a dangerous condition in the ALHS parking lot, nor any evidence that ALHS knew or should have known that the parking lot was unsafe or that Nisha might attack Marcelle or anyone else.

**{19}** Neither Villines nor Plaintiffs discussed what, if anything, the statutes and regulations governing New Mexico public schools require for the safe operation of student parking lots, the financial limitations within which public schools must operate, or the impact on any of the foregoing on the proffered "industry" standard of care. Nor did Plaintiffs adduce any evidence that ALHS made safety-related promises to Marcelle (or to any student) or that Marcelle's parents (or any parents of students) relied on any such

---

[4]Examples include materials that appear to address urban parking structures, crime prevention in general, workplace and "intimate partner" violence, and materials produced by the National Fire Protection Association.

promises.

**{20}** Plaintiffs offered no reason why expert testimony was necessary, or even relevant, to resolution of the legal question presented in the summary judgment motion—whether her negligence claim against ALHS falls within the Section 41-4-6(A) waiver of immunity. They simply cited the list of ALHS failures identified by Villines as material facts barring summary judgment, stating that they had "met their burden of coming forward with proof that ALHS was negligent under the premises liability rule of *Encinias*, or at least of demonstrating that disputed issues of material fact exist and preclude summary judgment in favor of ALHS."

**{21}** In reply, ALHS argued that the policies public schools are required to implement are not determined by expert testimony but are prescribed by the Public School Code (the PSC), NMSA 1978, §§ 22-1-1 to -33-4 (except Article 5A) (1967, as amended through 2017), and Chapters 11 and 12 of the New Mexico Administrative Code, which do not require the measures Villines said ALHS failed to implement, and that the Legislature expressly stated in the TCA that government entities are not obligated to do everything that might be done for the benefit of the public. For these and other reasons, ALHS said, the failures cited by Villines are not material.

**{22}** Noting Plaintiffs' representation that they did not rely on an *Encinias* theory of a pattern of violence, ALHS argued that Runnels' absence from her assigned post was a single instance of negligent supervision for which Section 41-4-6(A) does not waive immunity, reiterating that negligence claims based on student-on-student altercations are treated as claims for negligent supervision, for which Section 41-4-6(A) does not waive immunity, and that, despite her contrary assertions, Plaintiffs' claim is that ALHS was negligent in failing to have adequate supervision in the parking lot.

**{23}** ALHS further argued that Plaintiffs cannot establish that their claim falls within Section 41-4-6(A) based on an *Upton* theory of failure to follow a safety policy because there was no evidence that ALHS failed to implement or follow necessary safety policies, and ALHS had safety policies for student-on-student altercations and had assigned a staff member to monitor the parking lot. Even if Runnels' absence at the time of the incident was a safety policy failure, ALHS argued that this would not establish a waiver because the decision in *Upton* was based on and requires multiple safety policy failures.

**{24}** The district court granted ALHS's summary judgment motion. In ruling that Section 41-4-6(A) does not waive TCA immunity for Plaintiffs' claim, the court concluded that there was no pattern of violence or "hot zone" in the parking lot that ALHS failed to address, as in *Encinias*; to the extent the claim is based on the absence of adequate safety policies, ALHS had an unwritten policy of staff-member supervision of the parking lot after school; and multiple safety policy failures were not shown, as *Upton* requires. The court also determined that ALHS did not breach its duty of care to its students because "New Mexico law does not require that a public high school have a written policy concerning parking lot

safety."

**{25}**    Plaintiffs appeal, arguing that the district court erred in ruling that (1) ALHS is subject to the TCA; (2) ALHS is not required to have a written policy concerning student safety in its parking lot; (3) a Section 41-4-6(A) waiver based on *Upton* requires multiple policy failures; and (4) Plaintiffs failed to demonstrate a genuine dispute of material fact barring summary judgment.

**STANDARDS OF REVIEW**

**Summary Judgment**

**{26}**    We review summary judgment decisions de novo. *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 7, 148 N.M. 713, 242 P.3d 280. Although we ordinarily review the whole record in the light most favorable to the party opposing summary judgment, we do not do so where pure questions of law are at issue. *Rutherford v. Chaves Cty.*, 2003-NMSC-010, ¶ 8, 133 N.M. 756, 69 P.3d 1199 (stating this proposition in addressing the question whether the claim asserted in that case fell within a different TCA waiver), *abrogated on other grounds as recognized by Lujan v. N.M. Dep't of Transp.*, 2015-NMCA-005, ¶¶ 8-9, 341 P.3d 1; *Holguin v. Fulco Oil Servs. L.L.C.*, 2010-NMCA-091, ¶ 7, 149 N.M. 98, 245 P.3d 42.

**{27}**    Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 1-056(C) NMRA. If the movant establishes that there are no material fact issues and that it is entitled to judgment as a matter of law, "the burden shifts to the non-movant to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Romero*, 2010-NMSC-035, ¶ 10 (internal quotation marks and citation omitted). The non-movant cannot meet this burden with allegations or speculation but must present admissible evidence demonstrating the existence of a genuine issue of fact requiring trial. Rule 1-056(C), (E); *Romero*, 2010-NMSC-035, ¶ 10. If the non-movant fails to do so, "summary judgment, if appropriate, shall be entered against him." Rule 1-056(E).

**{28}**    To defeat summary judgment, allegedly disputed facts must be material, meaning that they are necessary to ground the claim under the governing law and will affect the outcome of the case. *Romero*, 2010-NMSC-035, ¶ 11; *see Martin v. Franklin Capital Corp.*, 2008-NMCA-152, ¶ 6, 145 N.M. 179, 195 P.3d 24 ("An issue of fact is 'material' if the existence (or non-existence) of the fact is of consequence under the substantive rules of law governing the parties' dispute."); *Farmington Police Officers Ass'n v. City of Farmington*, 2006-NMCA-077, ¶ 17, 139 N.M. 750, 137 P.3d 1204 ("In determining which issues of fact are material facts . . . we look to the substantive law governing the dispute.").

**{29}**    "A dispute as to facts that are not material does not preclude summary judgment[,]" and summary judgment is proper although disputed factual issues remain. *Hansler v. Bass*,

8

1987-NMCA-106, ¶ 11, 106 N.M. 382, 743 P.2d 1031; *see N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-005, ¶ 24, 126 N.M. 788, 975 P.2d 841 (explaining that disputed facts "do not preclude summary judgment without a showing that they are material"). Summary judgment is also proper "when a defendant negates an essential element of the plaintiff's case by demonstrating the absence of an issue of fact regarding that element." *Mayfield Smithson Enters. v. Com-Quip, Inc.*, 1995-NMSC-034, ¶ 22, 120 N.M. 9, 896 P.2d 1156; *see Goradia v. Hahn Co.*, 1991-NMSC-040, ¶ 18, 111 N.M. 779, 810 P.2d 798 ("A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." (alteration, internal quotation marks, and citation omitted)).

**{30}** The Rule 1-056 procedure "serve[s] a worthwhile purpose in disposing of groundless claims, or claims which cannot be proved, without putting the parties and the courts through the trouble and expense of full blown trials on these claims." *Goodman v. Brock*, 1972-NMSC-043, ¶ 11, 83 N.M. 789, 498 P.2d 676; *see Schmidt v. St. Joseph's Hosp.*, 1987-NMCA-046, ¶ 4, 105 N.M. 681, 736 P.2d 135 (recognizing that Rule 1-056 "expedite[s] litigation" by providing a procedure to "determin[e] whether a party has competent evidence to support his pleadings").

**Statutory Construction**

**{31}** Statutory interpretation is a pure question of law subject to de novo review. *See Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 22, 147 N.M. 583, 227 P.3d 73. This de novo standard applies to the determination of whether TCA immunity bars a tort claim. *Rutherford*, 2003-NMSC-010, ¶ 8.

**{32}** "In construing a statute, our charge is to determine and give effect to the Legislature's intent." *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 9, 146 N.M. 24, 206 P.3d 135; *see Truong*, 2010-NMSC-009, ¶ 29 ("[I]t is the high duty and responsibility of the judicial branch of government to facilitate and promote the [L]egislature's accomplishment of its purpose." (internal quotation marks and citation omitted)). In conducting this inquiry, we must consider the text of the provision(s) at issue in the context of the statute as a whole. *See State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939 (stating that courts must analyze a "statute's function within a comprehensive legislative scheme" and may not consider subsections "in a vacuum").

**DISCUSSION**

**As a Matter of Law, ALHS Is a Public School Subject to the TCA**

**{33}** The TCA provides that "[a] governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived" by enumerated exceptions. Section 41-4-4(A). Plaintiffs contend that ALHS is not entitled to TCA immunity because a privately operated charter school is neither a

9

governmental entity nor a public employee as defined in the TCA. Plaintiffs' argument appears to rest on the assertion that there is no reference to "charter schools" in the TCA and no reference to "immunity" in the CSA. For its part, ALHS cites statutory provisions defining "charter schools" as "public schools" and treating the two as having equivalent rights and responsibilities, and reasons that charter schools are protected by the TCA just as public schools are protected.

**{34}** We note that, although Plaintiffs filed an opposition to the motion to dismiss in which ALHS argued that (1) ALHS is a public school protected by the TCA and (2) Section 41-4-6(A) does not waive TCA immunity for Plaintiffs' claim, they did not respond to the subsequent summary judgment motion in which ALHS made a prima facie showing of entitlement to judgment as a matter of law that it is a TCA-protected public school by citing law and attaching the charter agreement and documents evidencing the renewal of its state charter. In declining to respond, Plaintiffs abdicated the burden imposed on them by the law of summary judgment. *See* Rule 1-056(E); *Romero*, 2010-NMSC-035, ¶ 10. Plaintiffs' failure to respond to the summary judgment motion could also be deemed a failure to preserve their argument here that the district court erred in ruling, after reviewing the documents ALHS submitted in support of the motion, that ALHS "is a [p]ublic [c]harter [s]chool under the provisions of the [TCA.]" Nevertheless, we exercise our discretion under Rule 12-321(B)(2)(a) NMRA to address this legal question of first impression in the public interest.

**{35}** To the extent Plaintiffs contend that there is no statutory support for the proposition that a "charter school" is a "public school" under New Mexico law, they are plainly wrong. Numerous statutes include "charter schools" in the definition of "public schools" and otherwise evidence the Legislature's intent to treat charter schools as public schools, except as otherwise provided.

**{36}** In the PSC, the Legislature defined "public school" to "include[] a charter school." Section 22-1-2(L). The Legislature also made clear in Article 8B of Chapter 22 of the CSA that charter schools are public schools and must comply with the same requirements applicable to public schools, except as otherwise provided. *See, e.g.*, § 22-8B-2(A) (defining "charter school" as "a conversion school or start-up school authorized by the chartering authority to operate as a public school"); § 22-8B-4(J) (stating that "[a] charter school shall be a nonsectarian, nonreligious and non-home-based public school"); § 22-8B-4(Q) (requiring charter schools to "comply with all state and federal health and safety requirements applicable to public schools"); § 22-8B-4(R) (stating, *inter alia*, that "[a] charter school is a public school that may contract with a school district or other party for provision of financial management, food services, transportation, facilities, education-related services or other services"); § 22-8B-5(D) (stating that "[a] charter school shall be a public school accredited by the department and shall be accountable to the chartering authority for purposes of ensuring compliance with applicable laws, rules and charter provisions"). The ALHS charter agreement tracks some of these provisions, stating that ALHS "shall be a nonsectarian, non-religious and non-home-based public school[,]" requiring that ALHS

comply with numerous statutes and regulations applicable to public schools, and obtain insurance from and comply with the rules of the Public School Insurance Authority.

**{37}** Other statutory provisions make clear that charter schools receive funding from the state and that receipt of public funds requires compliance with numerous requirements applicable to public schools, school boards, and school districts. *See generally* Chapter 22, Article 8 (the Public School Finance Act); *see, e.g.*, § 22-8-2(H) (defining "operating budget" as "the annual financial plan required to be submitted by a local school board or governing body of a state-chartered charter school"); § 22-8-2(L) (defining "public money" or "public funds" as "all money from public or private sources received by a school district or state-chartered charter school or officer or employee of a school district or state-chartered charter school for public use"); § 22-8-6.1 (requirements for charter school budgets); § 22-8-11(B) ("No school district or charter school . . . shall make any expenditure or incur any obligation for the expenditure of public funds unless that expenditure or obligation is made in accordance with an operating budget approved by the [public education] department.").

**{38}** Many provisions in the New Mexico Administrative Code addressing the administration of public schools similarly equate charter schools with public schools and make clear that charter schools are governed by the same regulations applicable to public schools. *See, e.g.*, 6.12.7.2 NMAC (stating that Chapter 12 regulations govern "[l]ocal school boards and all public schools, including charter schools"); 6.12.7.6 NMAC (stating a rule "establish[ing] requirements for local school boards and public schools, including charter schools, to address bullying of students by adopting and implementing policies and prevention programs"); 6.12.7.7(G) NMAC (defining "public school" as "a school as defined by Section 22-1-2 . . . , including charter schools").

**{39}** Plaintiffs do not argue that "public schools" are not "governmental entities" protected by the TCA, presumably because that would require them to reconcile that position with the fact that many New Mexico cases—including *Upton* and *Encinias*, upon which she relies—have treated public schools, school boards, and school districts as subject to the TCA. *See, e.g.*, *Pemberton v. Cordova*, 1987-NMCA-020, ¶ 4, 105 N.M. 476, 734 P.2d 254 (explaining, in a negligence case against a school board, that a claim against a government entity "must fit within one of the exceptions to the immunity granted, or it may not be maintained"). Indeed, Plaintiffs assert, "It is undisputed that Section 41-4-6(A) applies to school facilities[.]" Instead, they contend that a privately operated charter school is neither a governmental entity nor a public employee as defined in the TCA, so it is not entitled to the immunity the TCA affords to "a state-run school." We disagree.

**{40}** The TCA defines "governmental entity" as "the state or any local public body as defined in Subsections C and H of [the TCA's definitions] section[.]" Section 41-4-3(B). It defines "local public body" as "*all political subdivisions of the state* and their agencies, instrumentalities and institutions," Section 41-4-3(C) (emphasis added), and defines "state" or "state agency" as "the state of New Mexico or any of its branches, agencies, departments, boards, instrumentalities or institutions." Section 41-4-3(H). In addition to defining "charter

11

schools" as "public schools," the PSC defines "school district" as "an area of land established as *a political subdivision of the state* for the administration of *public schools*," Section 22-1-2(R) (emphasis added), and defines "public school" as "*that part of a school district* that . . . is discernible as a building or group of buildings generally recognized as either an elementary, middle, junior high or high school or any combination of those and *includes a charter school*[.]" Section 22-1-2(L) (emphases added).

**{41}** These provisions, taken together, establish that a "charter school" is a "public school" that operates as part of a "political subdivision[] of the state" and, as such, is a "governmental entity" within the meaning of Sections 41-4-3(B) and (C). A charter school also falls within the TCA's definition of "governmental entity" as including state "instrumentalities" and "institutions." Section 41-4-3(B), (H). Numerous statutory provisions, including many not cited here, reflect the interrelationship between charter schools and public schools, school boards, and school districts, and the Legislature's intent to treat charter schools as no less governmental entities than are public schools under New Mexico law.

**{42}** We see no evidence that the Legislature, in defining "charter schools" as "public schools," intended that this should be so for some purposes and not others, and Plaintiffs offer no reason that would support such an interpretation. This Court "presumes that the Legislature is aware of existing case law and acts with knowledge of it." *State v. Chavez*, 2008-NMSC-001, ¶ 21, 143 N.M. 205, 174 P.3d 988. The TCA had been in place for some twenty years when the Legislature enacted the CSA. If the Legislature had intended that charter schools and public schools be treated differently for some purposes, including under the TCA, it would have made that clear. We affirm the district court's ruling that ALHS is a public school and, as such, a governmental entity subject to suit only as permitted by an exception to the TCA's general rule of immunity.

**As a Matter of Law, Section 41-4-6(A) Does Not Waive TCA Immunity for Plaintiffs' Claim Against ALHS**

**1. The Relevant TCA Framework**

**{43}** The TCA provides that "[a] governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived" by enumerated exceptions. Section 41-4-4(A). In enacting the TCA, the Legislature reinstated the general rule of governmental immunity, abolished as a matter of the common law in *Hicks v. State*, 1975-NMSC-056, ¶ 15, 88 N.M. 588, 544 P.2d 1153, *superseded by statute as stated in Upton*, 2006-NMSC-040, ¶ 8, and declared it to be "the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the [TCA] and in accordance with the principles established in that act." Section 41-4-2(A). The Legislature stated its recognition of the unfairness resulting from "strict application of the doctrine of sovereign immunity" and also its intention that the "government should not have the duty to do everything that might be done" because "the

12

area within which the government has the power to act for the public good is almost without limit[.]" *Id.* Under the TCA, "the rule is immunity; waiver is the exception." *Upton*, 2006-NMSC-040, ¶ 29 (Minzner, J., dissenting).

**{44}** Where TCA immunity is waived by an enumerated exception to the general rule of immunity, liability is to be determined "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty[,]" provided that "[d]etermination of the standard of care required in any particular instance should be made with the knowledge that each governmental entity has financial limitations within which it must exercise authorized power and discretion in determining the extent and nature of its activities." Section 41-4-2(B); *see also Thompson v. City of Albuquerque*, ___-NMSC-___, ¶¶ 11, 17, ___ P.3d ___ (No. 35,974, June 19, 2017) (discussing TCA waiver as an issue determined before consideration of the elements of the claim based on traditional tort concepts). The TCA "in no way imposes a strict liability for injuries upon governmental entities or public employees." Section 41-4-2(B).

## 2. TCA-Specific Principles of Statutory Interpretation

**{45}** Our task in determining whether a TCA waiver applies is to ascertain and give effect to the Legislature's intent and purpose using the principles of statutory construction outlined above. *See Truong*, 2010-NMSC-009, ¶ 29; *Marbob Energy Corp.*, 2009-NMSC-013, ¶ 9. In doing so, we also must follow our Supreme Court's instruction that "[s]tatutory provisions purporting to waive governmental immunity are strictly construed." *Rutherford*, 2003-NMSC-010, ¶ 11.

**{46}** The policy statements in Section 41-4-2(A) make clear that, as Plaintiffs themselves contend, the Legislature did not intend government and private tortfeasors to receive identical treatment. *See Marrujo v. N.M. State Highway Transp. Dep't*, 1994-NMSC-116, ¶ 24, 118 N.M. 753, 887 P.2d 747 (explaining that "[g]overnmental entities are different from private parties," Section 41-4-2(A) demonstrates that "[t]he [L]egislature never intended government and private tortfeasors to receive identical treatment[,]" and "[t]he right to sue the government is a statutory right and the [L]egislature can reasonably restrict that right"); Ruth L. Kovnat, *Torts: Sovereign & Governmental Immunity in N.M.*, 6 N.M. L. Rev. 249, 261-62 (1976) (stating that "examination of the [TCA's] statutory structure compels the conclusion that the purpose of the act is to treat the State and other governmental entities differently from individuals because to do otherwise threatens the public treasuries too much").

**{47}** A determination that the TCA does not waive immunity for a negligence claim asserted against a governmental defendant obviates the need to address the elements of negligence. *See Armijo v. Dep't of Health & Env't*, 1989-NMCA-043, ¶ 5, 108 N.M. 616, 775 P.2d 1333 ("[W]e need not reach the issue of duty unless we determine that [the] plaintiff's cause of action is one for which immunity has been waived."); *see also Cobos v. Doña Ana Cty. Hous. Auth.*, 1998-NMSC-049, ¶ 19, 126 N.M. 418, 970 P.2d 1143 ("[I]t is

13

not enough for the public employees to have a duty—that duty must fit within the legislative intent of the [TCA] waiver in order to state a meritorious claim for relief."); *Espinoza v. Town of Taos*, 1995-NMSC-070, ¶ 14, 120 N.M. 680, 905 P.2d 718 (stating that even if the defendant "arguably had a duty in this case, there can be no liability for any breach of that duty because immunity has not been waived"); *Pemberton*, 1987-NMCA-020, ¶¶ 2-7 (rejecting the argument that a student allegedly struck and injured by another student stated a claim for which Section 41-4-6(A) waives a school board's immunity based on a statutory obligation to supervise students and explaining that a claim against a government entity "must fit within one of the exceptions to the immunity granted, or it may not be maintained").

{48} Relatedly, a showing that the facts support a negligence claim does not necessarily establish a waiver of TCA immunity. *See Milliron v. Cty. of San Juan*, 2016-NMCA-096, ¶ 2, 384 P.3d 1089 (concluding that "[the a]ppellant's well-pleaded facts, while potentially sufficient to support a claim of negligence, are insufficient to establish a waiver of the governmental immunity granted by Section 41-4-4(A)" and that "[b]ecause [the a]ppellees are immune from suit under the facts of the case, [the a]ppellant has not stated a claim upon which relief may be granted"); *Young v. Van Duyne*, 2004-NMCA-074, ¶ 33, 135 N.M. 695, 92 P.3d 1269 (explaining that "negligence arising out of the violation of a statutory duty does not change the immunity granted under the [TCA]"); *M.D.R. v. State ex rel. Human Servs. Dep't*, 1992-NMCA-082, ¶ 3, 114 N.M. 187, 836 P.2d 106 (stating that "it does not necessarily follow" from the fact that the department employees "have a responsibility to oversee and supervise the safety and well-being of children entrusted to" it that "the [d]epartment may be held liable under the [TCA] for a breach of that duty" because the TCA "declares that governmental entities and public employees shall only be liable within the limitations of its provisions" and "[t]he right to sue and recover is therefore specifically limited to the rights, procedures, limitations, and conditions of the [TCA]" (internal quotation marks and citation omitted)).

3.      **As a Matter of Law, Section 41-4-6(A) Does Not Waive Immunity for Plaintiffs' Claim Against ALHS**

{49} Consistent with the principles discussed above, the parties' arguments focus on the question whether Plaintiffs' claim against ALHS falls within Section 41-4-6(A), which waives sovereign immunity "for damages resulting from bodily injury . . . caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." For the reasons set forth below, we hold that it does not and affirm the district court's entry of summary judgment in favor of ALHS.

a.      **Plaintiffs' Claim Is for Negligent Supervision, a Single Student-on-Student Assault, for Which Section 41-4-6(A) Does Not Waive Immunity**

{50} Our Supreme Court has stated that it interprets Section 41-4-6(A) broadly, an

14

admonition that appears to have originated with cases holding that the waiver is not limited to a "physical defect" on the premises but applies " 'where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government[.]' " *Bober v. N.M. State Fair*, 1991-NMSC-031, ¶¶ 26-27, 111 N.M. 644, 808 P.2d 614 (quoting *Castillo v. Cty. of Santa Fe*, 1988-NMSC-037, ¶ 3, 107 N.M. 204, 755 P.2d 48); *see Archibeque v. Moya*, 1993-NMSC-079, ¶ 9, 116 N.M. 616, 866 P.2d 344 ("A careful reading of *Bober* and *Castillo* reveals that both cases rejected reading Section 41-4-6 to limit waiver of immunity to those instances where injury occurred due to a physical defect in a building."); *see also Callaway v. N.M. Dep't of Corr.*, 1994-NMCA-049, ¶ 17, 117 N.M. 637, 875 P.2d 393 (citing cases rejecting a "restrictive interpretation" limiting Section 41-4-6(A) waiver to physical defects on the premises and an interpretation that would apply "more restrictively based solely on a party's status as a prison inmate").

{51}    Caution is warranted given that exceptions to the TCA's general rule of immunity are strictly construed. *Rutherford*, 2003-NMSC-010, ¶ 11. Even assuming that the intended purpose of TCA waivers is remedial, judicial directives to read TCA waiver provisions broadly cannot be understood to authorize or require an interpretation that exceeds the boundaries of legislative intent. *M.D.R.*, 1992-NMCA-082, ¶¶ 12-13 (stating that courts should "read the relevant statutes in a manner that facilitates their operation and the achievement of their goals"; "we have to find the [L]egislature's goals in the words the [L]egislature chose or in the natural inferences from those words"; the TCA waiver provisions invoked by the plaintiffs did not waive immunity for the claim alleged; "it is not the function of the court of appeals to legislate"; and "[c]orrection of whatever inequity exists in such a situation" is for the Legislature (internal quotation marks and citation omitted)).

{52}    In any event, *Encinias*, our Supreme Court's most recent decision addressing the issue, affirms that Section 41-4-6(A), broadly interpreted, waives immunity only where the alleged negligence creates "an unsafe, dangerous, or defective condition on property owned and operated by the government." *Encinias*, 2013-NMSC-045, ¶ 10 (quoting *Castillo*, 1988-NMSC-037, ¶ 3); *see also Upton*, 2006-NMSC-040, ¶ 8 ("For the waiver to apply, the negligent 'operation or maintenance' must create a dangerous condition that threatens the general public or a class of users of the building.").

{53}    Our Supreme Court also explained in *Encinias* that it has "made it clear that there are limits to the waiver of immunity in Section 41-4-6(A)[,]" *Encinias*, 2013-NMSC-045, ¶ 12, and that these limits include the following: (1) "there is no waiver of immunity under Section 41-4-6(A) for negligent supervision"; (2) "[t]here can be no waiver under Section 41-4-6(A) without a dangerous condition on the premises, and a single act of student-on-student violence does not render the premises unsafe"; and (3) "one student's battery of another would not generally waive a school's immunity under Section 41-4-6(A)[.]" *Encinias*, 2013-NMSC-045, ¶¶ 12-14; *see also Upton*, 2006-NMSC-040, ¶ 16 (stating that, for the Section 41-4-6(A) waiver to apply, "the claim cannot be based solely on negligent supervision");

15

*Espinoza*, 1995-NMSC-070, ¶¶ 7, 14 (rejecting argument that absence of supervision at a town playground constitutes an "unsafe, dangerous, or defective condition" for which Section 41-4-6(A) waives immunity; holding that the inadequate supervision alleged "did not create the unsafe conditions" and that the playground itself "was a safe area for children" and "was not a condition requiring supervision"); *Leithead v. City of Santa Fe*, 1997-NMCA-041, ¶ 8, 123 N.M. 353, 940 P.2d 459 (agreeing that "a claim of negligent supervision, standing alone, is not sufficient to bring a cause of action within the waiver of immunity created by Section 41-4-6"); *Pemberton*, 1987-NMCA-020, ¶¶ 2-7 (holding that Section 41-4-6(A) does not waive immunity for a claim brought by a student allegedly struck and injured by another student against a school board based on a theory of negligent supervision).

**{54}** Plaintiffs contend that cases holding that Section 41-4-6(A) does not waive immunity for claims of negligent supervision do not apply because they do not allege negligent supervision. The record is to the contrary. Their complaint alleges that ALHS breached its duty "by failing to take reasonable precautions to keep the school safe" and "by failing to provide adequate security or supervision in the school parking lot." In responding to ALHS's argument below (in its Rule 1-012(B)(6) motion) that Plaintiffs' claim is for a single instance of negligent supervision, which does not fall within Section 41-4-6(A), Plaintiffs said their argument was that "a dangerous condition existed on the premises, namely the absence of adequate security, supervision, or employee oversight to prevent student fights." In responding to ALHS's similar argument on summary judgment, Plaintiffs said their claim is based on ALHS's failure to have an appropriate written policy for student safety in its parking lot and its failure on the day of the incident to follow its informal policy of having the parking lot monitored by a staff member.

**{55}** To the extent Plaintiffs contend that Section 41-4-6(A) waives immunity for their claim because they do not rely only on a theory of negligent supervision, but also on a failure to have or follow safety policies for parking lot users, we are not persuaded that this suffices to distinguish their claim from one for negligent supervision. Four of the six failures identified by Villines relate to "supervision" and "security" of the parking lot. On appeal, moreover, Plaintiffs rely solely on two of those purported failures—"to create written policies and procedures for the supervision of the parking lot" and "to establish a written security plan that included the parking lot at the high school[,]"—abandoning all others as a potential basis for reversal. *See Mason Family Tr. v. DeVaney*, 2009-NMCA-048, ¶ 6, 146 N.M. 199, 207 P.3d 1176 (determining that a party abandoned arguments made below but not in appellate briefs).

**{56}** Plaintiffs' attempt to recast their claim as one for negligent failure to have written safety policies concerning "supervision" and "security" in the parking lot is unavailing. They cite no statute, regulation, or case requiring New Mexico public schools to have such written policies. And they offered no evidence that lack of a written policy (as distinct from the unwritten policy of staff supervision of the parking lot ALHS undisputedly had) itself created a dangerous condition in the parking lot. While Plaintiffs contend that unwritten

16

policies can be undermined by "ad hoc decisions," they offer no evidence or argument demonstrating that written policies could not similarly be undermined. Regardless, the point was not argued below, and we decline to consider it. *See, e.g.*, *Nance v. L.J. Dolloff Assocs., Inc.*, 2006-NMCA-012, ¶ 12, 138 N.M. 851, 126 P.3d 1215 ("[W]e review the case litigated below, not the case that is fleshed out for the first time on appeal." (internal quotation marks and citation omitted)); *Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717 ("To preserve an issue for review on appeal, it must appear that [the] appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court."). Plaintiffs' assertion that Villines explained "why a written, rather than informal, policy is essential to establishing a safe school environment[,]" was not made below either. Moreover, they identify no specific statement but direct us to the entirety of the Villines affidavit and Opinion. "We will not search the record for facts, arguments, and rulings in order to support generalized arguments." *Muse v. Muse*, 2009-NMCA-003, ¶ 72, 145 N.M. 451, 200 P.3d 104.

**{57}** We conclude that Plaintiffs' claim is for negligent supervision—a single student-on-student altercation—which does not fall within Section 41-4-6(A), as broadly construed by our Supreme Court. *See Encinias*, 2013-NMSC-045, ¶ 12 ("[T]here is no waiver of immunity under Section 41-4-6(A) for negligent supervision."). Even assuming the claim is not solely one for negligent supervision, it still does not fall within the waiver, as we explain below.

**b.** ***Encinias* Does Not Require the Conclusion That Section 41-4-6(A) Waives TCA Immunity for Plaintiffs' Claim**

**{58}** In *Encinias*, the plaintiff contended that Section 41-4-6(A) waived immunity for his negligence claim against a high school and school district arising from injuries he sustained when another student attacked him in an area where students patronized food vendors, which an assistant principal described in an affidavit as a "hot zone" for student violence. *Encinias*, 2013-NMSC-045, ¶¶ 2, 13. Our Supreme Court held that the government can be liable for the violent acts of a third party under a premises liability theory "if the government reasonably should have discovered and could have prevented the incident" and that the plaintiff had established a genuine issue of material fact as to the existence of a dangerous condition on school premises based on the assistant principal's "hot zone" statement. *Id.* ¶¶ 17-18.

**{59}** In reaching its decision in *Encinias*, the Court re-affirmed its longstanding interpretation of Section 41-4-6(A) that "[t]here can be no waiver under Section 41-4-6(A) without a dangerous condition on the premises, and a single act of student-on-student violence does not render the premises unsafe." *Encinias*, 2013-NMSC-045, ¶ 13. The Court distinguished *Pemberton*, in which the plaintiff claimed to have been struck and injured by another student, noting that "[t]he plaintiff in *Pemberton* specifically alleged negligent supervision but did not allege that the school was negligent in failing to exercise reasonable care to discover and prevent dangerous conditions caused by people on its premises" and did not allege "a broader pattern of violence at the school, or any facts to suggest that the school,

17

in the exercise of ordinary care, could have discovered that the violence was about to occur and that the school could have protected the student from injury." *Encinias*, 2013-NMSC-045, ¶ 13 (citing *Pemberton*, 1987-NMCA-020, ¶ 2). "While one student's battery of another would not generally waive a school's immunity under Section 41-4-6(A), a school's failure to address a pattern of student violence in a particular area might create an unsafe condition on the premises." *Encinias*, 2013-NMSC-045, ¶ 14.

**{60}** *Encinias* thus distinguished a negligent supervision case, as in a single student-on-student altercation, from a case in which there is evidence of a prior history of violence that the defendant, in the exercise of ordinary care, reasonably could have discovered and acted upon to prevent injury to the plaintiff. *See id.* ¶¶ 16-18 (citing cases for "the operative principle" that businesses and government "must exercise reasonable care to discover and prevent dangerous conditions caused by people on their premises"; holding that the "hot zone" affidavit sufficed to "raise questions about the degree of student violence and the school's efforts to discover and prevent student violence in that area" and to establish a genuine issue of material fact "as to whether there was a dangerous condition on the premises of the high school").

**{61}** There is no evidence in this case (or even an allegation) that the ALHS parking lot was a "hot zone." Plaintiffs, moreover, explicitly disclaimed reliance on a theory that "the high school parking lot was a 'hot zone' for violence," citing *Encinias* only for its general statement that "the facts of a case will support a waiver under Section 41-4-6(A) if they would support a finding of liability against a private property owner." *Encinias*, 2013-NMSC-045, ¶ 15. On appeal, Plaintiffs make no specific argument based on *Encinias*, merely reciting that same general statement and the equally general statement that "Section 41-4-6(A) incorporates the concepts of premises liability found in our case law." The lack of developed argument is reason enough for us to decline to consider whether *Encinias* requires reversal. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (refusing to consider a cursory argument that included no explanation and no facts permitting evaluation of the claim).

**{62}** Regardless, Plaintiffs cannot establish a waiver simply by reciting these general statements, while disregarding the legal and factual context grounding the *Encinias* Court's actual holding that the assistant principal's affidavit demonstrated a genuine issue of material fact as to whether there was a dangerous condition that the school might reasonably have discovered and mitigated in the exercise of ordinary care. *See* 2013-NMSC-045, ¶ 18. Plaintiffs did not adduce competent evidence of the existence of a dangerous condition in the school parking lot or that ALHS knew or should have known that the parking lot was unsafe, or that ALHS knew or should have known that Nisha had a propensity for violence or posed a threat to Marcelle (or to anyone at the school). Plaintiffs did not allege any of these things. *See, e.g.*, *Castillo*, 1988-NMSC-037, ¶ 10 (stating that the defendant's liability depended on what it "knew or should have known about loose-running dogs in the common area, whether such loose-running dogs should have been foreseen as a threat to the safety of the residents and invitees, and the means at the disposal of the [defendant] to control the

18

presence of loose-running dogs"; holding that the complaint alleging "knowledge on the part of the defendant of the unsafe condition represented by dogs running loose within the project" stated a claim within Section 41-4-6(A)); *Callaway*, 1994-NMCA-049, ¶ 19 ("[The p]laintiff has stated a claim sufficient to waive immunity under Section 41-4-6 because [the d]efendants knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable."); *see also Saiz v. Belen Sch. Dist.*, 1992-NMSC-018, ¶¶ 43-44, 113 N.M. 387, 827 P.2d 102 (stating that liability under the TCA "is based solely" on a breach of the "reasonably prudent person's standard of care," which requires evidence of "the foreseeability, *to one who has or should have knowledge*, that his or her act or failure to act will result in an unreasonable risk of injury" (internal quotation marks and citation omitted)).

**{63}**     Plaintiffs claim that "[a]s a general proposition, parking lots can be dangerous[,]" quoting a statement by Villines referencing "[t]he nature of heavy foot and vehicle traffic at certain times of the day" and "the combination of ease of access and lack of natural surveillance in many parking lots[.]" But they did not argue this point below, and they offer no connection between this "general proposition" and the condition of the ALHS parking lot at the time of the incident. In fact, Plaintiffs offered no evidence that any of the purported failures identified by Villines made the parking lot unsafe or that implementation of any of the measures he discussed would have prevented the assault. While Villines characterized the failures he cited as breaches of his proffered "industry" standard of care, he did not say that the parking lot was in a dangerous condition, and to the extent Plaintiffs argue that it was, they have characterized that condition only as a lack of supervision.

**{64}**     Furthermore, the issue presented in this case is the legal question whether Section 41-4-6(A) waives immunity for the claim alleged, and Plaintiffs do not explain how their expert's opinions as to what constitutes the standard of care and the ways in which ALHS breached that standard are material under the governing law, or even relevant, to our determination of that question. *See, e.g.*, *Espinoza*, 1995-NMSC-070, ¶ 14 (stating that even if the defendant "arguably had a duty . . . , there can be no liability for any breach of that duty because immunity has not been waived"); *Martin*, 2008-NMCA-152, ¶ 6 ("An issue of fact is 'material' if the existence (or non-existence) of the fact is of consequence under the substantive rules of law governing the parties' dispute."); *Young*, 2004-NMCA-074, ¶ 33 (explaining that "negligence arising out of the violation of a statutory duty does not change the immunity granted under the [TCA]"); *M.D.R.*, 1992-NMCA-082, ¶ 3 (stating that "it does not necessarily follow" from the fact that the department employees "have a responsibility to oversee and supervise the safety and well-being of children entrusted to" it that "the [d]epartment may be held liable under the [TCA] for a breach of that duty" because the TCA "declares that governmental entities and public employees shall only be liable within the limitations of its provisions" (internal quotation marks and citation omitted)).

19

**{65}**     Plaintiffs seem to assume that all they need do to demonstrate that their claim falls within Section 41-4-6(A) is allege negligence under a "premises liability" theory. This is incorrect. While claims determined to fall within Section 41-4-6(A) are analyzed as premises liability cases, a negligence claim is not actionable against a government defendant unless it falls within the waiver. *See, e.g.*, *Thompson v. City of Albuquerque*, ___-NMSC-___, ¶¶ 11, 17 (discussing TCA waiver as an issue determined before consideration of the elements of the claim based on traditional tort concepts). As a matter of law, Plaintiffs have not established that Section 41-4-6(A) waives immunity for their claim against ALHS based on *Encinias*.

**c.**     *Upton* **Does Not Require the Conclusion That Section 41-4-6(A) Waives TCA Immunity for Plaintiffs' Claim**

**{66}**     Plaintiffs argue, citing *Upton*, that their claim is "a type of claim" that our Supreme Court recognized as distinct from negligent supervision and within Section 41-4-6(A)—"namely, where public employees fail to have or follow safety policies that apply to those who use a public building." According to Plaintiffs, "this is the ultimate distinction that makes a difference in the present case." We disagree. The district court's conclusion that "New Mexico law does not require that a public high school have a written policy concerning parking lot safety" is not contrary to *Upton*, as Plaintiffs contend; nor did the court err in reading *Upton*'s holding as premised on multiple policy failures.

**{67}**     In *Upton*, the parents of a student who died from an asthma attack after a substitute physical education teacher required her to participate in strenuous exercise sued a school district for negligence, arguing that Section 41-4-6(A) waived immunity. *Upton*, 2006-NMSC-040, ¶ 1. The claim was based on allegations of a course of negligent conduct by school personnel over two time periods that created an unreasonable risk of harm to their daughter, Sarah, and other students with medical conditions. *Id.* ¶ 10.

**{68}**     The plaintiffs alleged that they had advised Sarah's physical education teacher and the school of Sarah's condition, verbally and in writing; the teacher agreed that Sarah could limit her participation if she felt that exercise was triggering an asthma attack; and Sarah's condition and the special services she would need were documented in an individualized education plan (IEP) with the school. *Id.* ¶¶ 2, 10. The plaintiffs had instructed that school personnel could immediately contact medical personnel directly in the event of an attack and had received assurances that Sarah's special needs would be met. *Id.* The attack occurred, they claimed, because the school negligently failed to inform the substitute teacher of Sarah's special needs, creating a dangerous condition for Sarah, and the teacher made Sarah perform strenuous exercise, even though Sarah told the teacher of her distress. *Id.* The plaintiffs further alleged that the school negligently failed to respond to the attack, resulting in Sarah's death, by waiting fifteen minutes after Sarah's distress was noticed to call 911 and by failing to administer CPR, although it was clear from the onset of the attack that Sarah was not breathing well and turning blue. *Id.* ¶ 11.

**{69}** In reversing the district court's entry of summary judgment for the school district, our Supreme Court affirmed the longstanding holding that Section 41-4-6(A) does not waive immunity for claims "based solely on negligent supervision[,]" *Upton*, 2006-NMSC-040, ¶ 16, and that "[f]or the waiver to apply, the negligent 'operation or maintenance' must create a dangerous condition that threatens the general public or a class of users of the building." *Id.* ¶ 8. The Court concluded, however, that the waiver applies to "safety policies necessary to protect the people who use the building" and that the school district created a dangerous condition by failing "to follow procedures established for at-risk students," which "students have been promised, and upon which parents have relied." *Id.* ¶¶ 9, 13. The Court rejected the argument that "the [plaintiffs'] complaint amounts to nothing more than a claim of negligent supervision of one student during a physical education class," stating that the plaintiffs "challenge far more than a single failure of oversight by one overworked teacher." *Id.* ¶¶ 15, 18. The Court explained:

> [T]he [plaintiffs] challenge the [s]chool [d]istrict's general failure to implement promised safety policies for at-risk students. The [plaintiffs] claim the [s]chool [d]istrict negligently put in motion a chain of events that both preceded and followed the specific decisions of the hapless substitute teacher. The school failed to implement Sarah's IEP, to respond appropriately to the specific information it was given about Sarah's condition, and to implement the specific assurances given to the [plaintiffs] about the care the school was to provide in light of Sarah's special needs. The substitute teacher, a school employee, forced Sarah to continue her exercise despite tangible evidence of her distress. Then, the school failed to properly implement its emergency procedures. Faced with Sarah's acute distress, the school never administered CPR, no one called 911 in a timely manner, Sarah was simply wheeled outside to await emergency personnel.

*Id.* ¶ 18.

**{70}** The Court reasoned that, if the only negligence alleged was the substitute teacher's failure to watch Sarah during physical exercise, the claim would be "much closer to the single administrative decision in *Archibeque* [and] practically identical to the single claim of negligent supervision we found inadequate in *Espinoza*[,]" but that the conduct alleged went "beyond these limits." *Upton*, 2006-NMSC-040, ¶ 21. Our Supreme Court further stated:

> First the school ignored the information it was given by the [plaintiffs]. This led to the school actively participating in causing the asthma attack by forcing Sarah to do more exercise than she was supposed to do. Actively forcing students, who are known to have health problems, creates a foreseeable risk that such a health emergency will occur. Then the school failed to follow through with proper emergency procedures, negligent omissions that exacerbated the problem caused by its previous negligent

21

actions. These actions and omissions combined to create the dangerous condition, placing Sarah in a far worse position than the reasonable and expected risks of school life.

*Id.* (alteration and internal quotation marks omitted).

**{71}** Contrary to Plaintiffs' arguments, *Upton* does not require the conclusion that Section 41-4-6(A) waives immunity for her claim against ALHS. First, nothing in *Upton* can be read as a general rule requiring that public schools must have written policies concerning supervision of school parking lots. Second, Plaintiffs are wrong in asserting (quoting *Upton*, 2006-NMSC-040, ¶ 13) that "a policy concerning student safety in the school parking lot is precisely the type of 'safety service[] that students have been promised, and upon which parents have relied.' " They have neither alleged nor submitted any evidence that any promises were made to Marcelle (or to anyone) concerning the parking lot or that any parent relied on any such promise. Plaintiffs are also wrong to the extent they contend that their claim is actionable under *Upton* based on a theory that Runnels' absence from the parking lot at the time of the incident is a failure to follow the ALHS policy requiring monitoring of the parking lot after school.

**{72}** As the foregoing discussion makes clear, *Upton*'s holding was expressly predicated on facts not even alleged here: a student with special medical needs; parents who previously advised the school and the student's teacher of those needs and of the procedures required to address them, which were documented in the student's IEP; assurances from the school and the teacher that the student's needs would be addressed; and a course of conduct over a period of time involving multiple acts of alleged negligence, including failure to respond to the medical emergency that developed after the onset of the student's asthma attack. *See* 2006-NMSC-040, ¶¶ 2, 10, 18. *Upton*'s holding that Section 41-4-6(A) waived immunity for the claim in that case was based on numerous facts and circumstances not present in this case.

**{73}** Plaintiffs' citation to two cases involving swimming pools (which they characterizes as "the *Upton* line of cases") does not alter our conclusion that their safety policy theory fails to demonstrate a waiver.

**{74}** In *Seal v. Carlsbad Independent School District*, 1993-NMSC-049, 116 N.M. 101, 860 P.2d 743, the plaintiff's decedent, a physically and mentally disabled eighteen-year-old who could not swim, drowned in a pool owned and operated by the school district while he participated in an aquatic camp planned, provided, and supervised by the Boy Scouts. *Id.* ¶ 2. Our Supreme Court reversed summary judgment for the defendant, in part, because of its concern that the district court did not consider allegations of the school district's "primary negligence" for "failing to ensure that a properly trained lifeguard was present *and acting as such* and by failing to provide necessary safety equipment," both required by regulations. *Id.* ¶¶ 9-10, 17. *Seal* does not even mention Section 41-4-6(A).

**{75}** In *Espinoza*, our Supreme Court explained that, in contrast to *Seal*, where "the unsafe condition of the premises was a swimming pool without the superintending lifeguard protection required by statute[,]" the town playground in *Espinoza* "was a safe area for children" and "not a condition requiring supervision" and the alleged negligent supervision of children at the playground did not create an unsafe condition. 1995-NMSC-070, ¶ 14. Noting that "[t]he Legislature has expressly stated that because of the broad range of the government's activities, it 'should not have the duty to do everything that might be done' for the benefit of the public[,]" the Court held that "[e]ven if the [defendant] arguably had a duty in this case, there can be no liability for any breach of that duty because immunity has not been waived." *Id.* (quoting Section 41-4-2(A)).

**{76}** *Leithead* involved a negligence claim brought on behalf of Amanda Leithead, who nearly drowned in a city swimming pool when she was six years old. 1997-NMCA-041, ¶¶ 1-4. Amanda and other children enrolled in a YMCA program were allowed into the pool without any inquiry concerning the ages or heights of the children, despite pool regulations requiring adult supervision for children younger than seven and under forty-eight inches in height. *Id.* ¶ 2. *Leithead* affirmed that "a claim of negligent supervision, standing alone, is not sufficient to bring a cause of action within the waiver of immunity created by Section 41-4-6[,]" but held that the allegations and evidence presented brought the claim within the waiver. *Leithead*, 1997-NMCA-041, ¶ 8. This Court reasoned as follows:

> A swimming pool without an adequate number of trained lifeguards creates a dangerous condition on the physical premises which affects the swimming public at large. In fact, lifeguard services are so essential to the safety of a swimming pool that they seem akin to other kinds of safety equipment, such as lifelines and ladders, that are fundamental in making the premises reasonably safe for the swimming public. Failure to provide those services in reasonable quantity and quality (lifeguards "present and acting as such") makes the premises unsafe.

*Id.* ¶ 15. In contrast, "negligent supervision of a child in the [defendant's] care did not create an unsafe condition," and "[t]he [defendant's] fault [in *Espinoza*] lay in negligently administering a summer day camp which . . . is not a category for which sovereign immunity has been waived under the [TCA]." *Leithead*, 1997-NMCA-041, ¶ 9.

**{77}** The unsupervised public school parking lot in this case bears no similarity to a public swimming pool without the lifeguards and safety equipment required by regulations. As *Upton* acknowledged, "a school building is not as inherently dangerous as a swimming pool[.]" 2006-NMSC-040, ¶ 19. In *Upton* our Supreme Court distinguished the plaintiffs' claim from a claim of negligent supervision based on numerous facts. *Id.* ¶ 21. The allegations and evidence Plaintiffs present do not require or permit us to draw the same distinction here and do not support the conclusion that either the absence of a written policy concerning supervision of the ALHS parking lot or the absence of a supervisor in the parking lot at the time of the incident brings Plaintiffs' claim within Section 41-4-6(A).

**No Genuine Issue of Material Fact Precludes Entry of Summary Judgment for ALHS**

**{78}** Plaintiffs contend that they proffered "numerous disputed issues of material fact, each of which were sufficient to preclude judgment in ALHS'[s] favor." Plaintiffs do not identify a single one. Instead, they recite the list of failures identified by Villines, asserting that they demonstrate that ALHS "breached the standard of care that requires schools to have appropriate written policies in place for student safety."

**{79}** As discussed above, Plaintiffs rely solely on the failures of ALHS to have written policies for supervision and security in the parking lot, while providing no basis for distinguishing them from a claim of negligent supervision. As also discussed, Plaintiffs do not explain how the opinions of their expert concerning the standard of care and the ways in which ALHS breached it[5] are material under the governing law to our determination of the legal question of whether Section 41-4-6(A) waives immunity for their claim. Nor have they identified any other genuine dispute of fact material to the waiver determination. In short, Plaintiffs have failed to demonstrate that there are any material issues of fact on the question of whether the ALHS parking lot had any condition that rendered it unsafe, dangerous, or defective that caused the incident between Nisha and Marcelle to take place. Having concluded as a matter of law that there is no waiver, we have no need or reason to consider evidence concerning the elements of negligence. *See, e.g.*, *Espinoza*, 1995-NMSC-070, ¶ 14; *Armijo*, 1989-NMCA-043, ¶ 5. Even if the facts did support a negligence claim, this would not suffice to establish a waiver. *See Milliron*, 2016-NMCA-096, ¶ 2; *Young*, 2004-NMCA-074, ¶ 33; *M.D.R.*, 1992-NMCA-082, ¶ 3.

**CONCLUSION**

**{80}** For the foregoing reasons, we affirm the district court's rulings that ALHS is a public

---

[5]We note that it is not clear from the materials submitted by Villines that he is competent, based on education, training, experience, and personal knowledge, to testify as an expert on the standard of care applicable to New Mexico public school parking lots, as the rules require. *See* Rule 1-056(E) (requiring that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"); Rule 11-702 NMRA (permitting opinion testimony by a "witness who is qualified as an expert by knowledge, skill, experience, training, or education . . . if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"). It is also not clear that expert testimony would be required in this case, even if the claim did fall within the waiver. *See Mott v. Sun Country Garden Prods., Inc.*, 1995-NMCA-066, ¶ 34, 120 N.M. 261, 901 P.2d 192 ("[I]f the fact in issue is within the ken of the average lay juror, expert opinion testimony is not necessary."). ALHS does not raise these issues and, in light of our disposition of the waiver issue, we need not reach them.

school protected by the TCA, that Plaintiffs' negligence claim against ALHS does not fall within the waiver of immunity provided by Section 41-4-6(A), and its entry of summary judgment in favor of ALHS, dismissing Plaintiffs' claim against ALHS with prejudice.

**{81}    IT IS SO ORDERED.**

_____

**LINDA M. VANZI, Chief Judge**

**I CONCUR:**

_____

**MICHAEL E. VIGIL, Judge**

**GARCIA, Judge (specially concurring).**

**{82}**    I write to specially concur with the majority in this case. Plaintiffs filed a docketing statement that was forty-nine days late. *See* Rule 12-208(B) NMRA  ("Within *thirty (30) days* after filing the notice of appeal . . . the appellant *shall file* a docketing statement[.]" (emphasis added)). Plaintiffs also failed to provide any reasonable justification for this delay or otherwise request an extension of time to allow for the late filing of their docketing statement. *See* Rule 12-312(A) NMRA ("If an appellant fails to file a docketing statement in the Court of Appeals . . . *as provided by these rules*, such failure may be deemed sufficient grounds for dismissal of the appeal by the appellate court." (emphasis added)); *see also Johnson v. Sch. Bd. of Albuquerque Pub. Sch. Sys.*, 1991-NMCA-062, ¶ 6, 113 N.M. 117, 823 P.2d 917 (recognizing the appellate court's discretion to grant an extension for filing a docketing statement that is only "a few days late").

**{83}**    Although our calendaring system allows for the late filing of the docketing statement and subsequent briefing by the parties, any accommodation within the appellate process does not prevent this Court from addressing the merits of the untimely docketing statement once the district court record has been received and the case is assigned to the general calendar. *See Johnson*, 1991-NMCA-062, ¶ 3 (noting that "until a docketing statement has been filed in this [C]ourt, we cannot consider the merits of the appeal because we rely on the docketing statement under our calendaring system to provide us with the facts and issues sought to be raised"). We also note that the "refusal to consider the offending party's contentions" is one of less severe actions that the appellate court may consider as an appropriate sanction for the late filing of an appellant's docketing statement. Rule 12-312(D). *But see State v. Lope*, 2015-NMCA-011, ¶ 8, 343 P.3d 186 (recognizing that in criminal appeals, we are obligated to accept a defendant's appeal that is filed late based upon "a conclusive presumption of ineffective assistance [of counsel]" in those circumstances).

**{84}**    Plaintiffs provided no justification for the late filing of their docketing statement and it was substantially more than a few days late. Under the circumstances, Rule 12-312(D)

permits this Court to refuse to consider Plaintiffs' issue of first impression—whether the lack of parking lot policy at ALHS qualifies as an exception under Section 41-4-6(A) of the TCA. I choose to exercise this Court's discretion under Rule 12-312(D) to refuse to address Plaintiffs' TCA issue for two reasons. First, forty-nine days late is not justified without a well-articulated reason and valid justification for filing the docketing statement late. Secondly, the application of paragraph fifteen in *Encinias* was not well-developed by Plaintiffs' briefs to this Court, and the issue of a broader TCA exception—being one of first impression—is rather perplexing. *See* 2013-NMSC-045, ¶ 15. Although this Court might certify both issues to our Supreme Court for clarification under Rule 12-606 NMRA, I would simply choose to affirm based upon Rule 12-312. Having sat by designation on *Encinias*, I remain confused by our Supreme Court's recognition of the "dangerous condition" element of TCA liability and the added dicta for TCA liability in paragraph fifteen—if the facts "would support a finding of liability against a private property owner." 2013-NMSC-045, ¶¶ 13-15. These statements are not mutually compatible, and our Supreme Court gave no guidance to assist the lower courts with this dilemma. I respect my colleagues' efforts to address the issue in this case but prefer to specially concur due to Plaintiffs' defectively late docketing statement.

{85}    For the reasons stated herein, I specially concur with the majority and would affirm the district court's two orders.

_____
**TIMOTHY L. GARCIA, Judge**

26